**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Victor EISENSTEIN, Beno Ghitis,
Defendants-Appellants.**

**No. 83–5136.**

United States Court of Appeals,
Eleventh Circuit.

May 14, 1984.

---

5. 29 C.F.R. §§ 1613.601–1613.643.

L. Mark Dachs, Miami, Fla., for Eisenstein.

Raymond J. Takiff, Coconut Grove, Fla., Marc Cooper, Miami, Fla., for Ghitis.

Stanley Marcus, U.S. Atty., Charles Saphos, Linda Collins-Hertz, Asst. U.S. Attys., Miami, Fla., for U.S.

Before GODBOLD, Chief Judge, and HILL, Circuit Judge, and THORNBERRY *, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

A jury convicted appellants of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 (1976), and felonious failure to file currency transaction reports (CTRs) with the Internal Revenue Service, as required by 31 U.S.C. §§ 1059, 1081, 1082 (1976),[1] and regulations promulgated under those provisions. Ample evidence supported the convictions. Neither appellant asserted that the CTRs were actually filed. Nevertheless, we must reverse the convictions because appellants were prohibited from establishing their one plausible line of defense, good faith reliance on advice of counsel.

## I. BACKGROUND

Appellant Ghitis owned and operated a currency exchange business in Cali, Colombia. Ghitis testified that the major thrust of his business concerned buying American dollars and exchanging them for Colombian pesos or for checks or money orders. According to Ghitis, a typical exchange transaction involved four steps: (1) Ghitis agreed to buy American dollars from a seller in Colombia; (2) the seller directed his agent in the United States to deposit the dollars in Ghitis' U.S. bank account; (3) Ghitis verified the deposit; and (4) Ghitis gave the seller pesos or checks to cover the amount deposited. Later, Ghitis hired Appellant Eisenstein to run a branch office for the currency exchange in Miami, enabling Eisenstein, rather than the seller's agent, to make the deposits and report the transactions to Ghitis.

The Government introduced Ghitis' business records for the first eight months of 1981 to show that the exchange business took in more than $240 million during that period. Bank officials in Miami, no doubt alerted by the staggering amounts of money flowing into Ghitis' account, told Eisenstein in January of 1981 that he was required to file CTRs for the currency exchange for any transaction that exceeds $10,000. Eisenstein promised to ask Ghitis about the CTRs. Eisenstein later assured bank officials that he had mentioned the CTRs to Ghitis.

However, no CTRs were filed by Ghitis or Eisenstein. They were thus indicted for failing to report a $1 million transaction that occurred in late February of 1981 and a $1.5 million transaction that occurred in March of 1981. In addition, the indictment alleged a conspiracy to violate the reporting laws and a pattern of illegal activity involving currency transactions in excess of $100,000 in a twelve-month period. Both appellants were convicted on all counts.

## II. DISCUSSION

Ghitis and Eisenstein appeal their convictions on several grounds. In light of our decision to reverse, we reach only two of the issues raised by appellants' arguments: (1) whether appellants' currency exchange business was a "domestic financial institution" covered by 31 U.S.C. § 1081; and (2) whether the district court erroneously excluded evidence that appellants relied in good faith on the advice of counsel in re-

---

* Honorable Homer Thornberry, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The applicable provisions of the Currency and Foreign Transactions Reporting Act were originally codified at 31 U.S.C. §§ 1051–83 (1976). After revision and recodification, those provisions now appear at 31 U.S.C. §§ 5301–22 (1982).

fusing to file the CTRs. We conclude that the statute covers Ghitis' business but that the erroneous exclusion of highly relevant evidence requires reversal.

### A. *Domestic Financial Institutions.*

■ By enacting the Currency and Foreign Transactions Reporting Act, Congress authorized the Secretary of the Treasury to require certain types of financial institutions to report currency transactions. *See* 31 U.S.C. § 1051 (1976) (revised version at 31 U.S.C. § 5311 (1982)). Under the Act, "domestic financial institutions" must report any exchange of United States currency exceeding the amount prescribed by the Treasury Secretary. *See* 31 U.S.C. § 1081 (1976) (revised version at 31 U.S.C. § 5313 (1982)). The Secretary has promulgated regulations that require such institutions to report exchanges involving more than $10,-000. *See* 31 C.F.R. § 103.22(a).

Appellants concede that on at least two occasions they completed currency exchange transactions involving more than $10,000. They argue, however, that they were not required to file reports on the transactions because their currency exchange business is not a *domestic* financial institution within the meaning of the Act. Appellants base their argument on the testimony of Ghitis that all transactions were negotiated and completed in Colombia, leaving nothing for Eisenstein to do in Miami except deposit the money and report to Ghitis in Colombia.

We find appellants' reasoning unpersuasive. The statutory definition of "domestic" is clear:

> The term "domestic" used in reference to institutions or agencies, limits the applicability of the provision wherein it appears to the performance by such institutions or agencies of functions within the United States.

31 U.S.C. § 1052(f) (1976) (revised version at 31 U.S.C. § 5312(b) (1982)).[2]

Appellants' currency exchange business performs "functions within the United States" by receiving dollars in the United States, by depositing the money in a U.S. bank, and by relaying information about each transaction from Miami to headquarters in Colombia. Therefore, the business was a "domestic financial institution" under the Act.

### B. *Reliance on Advice of Counsel.*

■ Only *willful* failures to file CTRs are subject to criminal penalties under the Act. *See* 31 U.S.C. § 1058 (1976) (revised version at 31 U.S.C. § 5322 (1982)). The law of this circuit is well established that, as it is used in the currency reporting statute, the term *"willful* require[s] proof of the defendant's knowledge of the reporting requirement and his specific intent to commit the crime." *United States v. Granda,* 565 F.2d 922, 926 (5th Cir.1978). Congress no doubt made the failure to file CTRs a specific intent crime because, without knowledge of the reporting requirement, a would-be violator cannot be expected to recognize the illegality of his otherwise innocent act. *See id.* at 925–26; *United States v. Warren,* 612 F.2d 887, 890 (5th Cir.) (en banc), *cert. denied,* 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980).

■ A defendant charged with violating the reporting statute can attempt to negate proof of specific intent by establishing the defense of good faith reliance on advice of counsel. *United States v. Bush,* 599 F.2d 72, 76–78 (5th Cir.1979). In order to take advantage of this defense, the defendant must show that he relied in good faith after first making a full disclosure of all facts that are relevant to the advice for which he consulted the attorney. *See United States v. Taglione,* 546 F.2d 194, 200–01 (5th Cir. 1977); *Bursten v. United States,* 395 F.2d 976, 981–82 (5th Cir.1968). When the defendant presents evidence that he disclosed

---

2. As revised, the statute reads:
"[D]omestic financial agency" and "domestic financial institution" apply to an action in the United States of a financial agency or institution.
31 U.S.C. § 5312(b)(1) (1982).

all relevant facts to his attorney and relied on the attorney's advice based on the disclosure, the trial court must instruct the jury on the defense of good faith reliance on counsel. *Bursten v. United States,* 395 F.2d at 982.

Here, the trial court gave appellants' requested instruction on the advice of counsel defense. The jury was told:

> Among their defenses, the defendants claim that they are not guilty of willful wrongdoing because they acted on the basis of advice from an attorney.

> If a defendant, before taking any action, sought the advice of an attorney whom he considered competent, in good faith and for the purpose of securing advice on the lawfulness of his possible future conduct, and made a full and accurate report to his attorney of all material facts of which he has the means of knowledge concerning, in this case, the necessity of filing a currency transaction report, that is, IRS Form 4789, and acted strictly in accordance with the advice of his attorney, given following his full report, then the defendant would not be willfully doing wrong in omitting something the law requires, as that term is used in these instructions.

> Whether a defendant acted in good faith for the purpose of seeking guidance as to the questions about which he is in doubt, and whether he made a full and complete report to his attorney concerning the necessity of filing a currency transaction report[,] IRS Form 4789, and whether he acted strictly in accordance with the advice received are questions for you to determine.

Record on Appeal at 770–71.

Clearly, the instructions emphasized the importance of the "full disclosure" requirement. The jury, however, was deprived of evidence that was relevant, indeed crucial, to its determination of whether Ghitis and Eisenstein made a "full and complete report" to their attorney. After defense counsel established that Ghitis and Eisenstein met with their attorney on at least one occasion prior to the acts charged in the indictment, the following colloquy occurred between defense counsel and the attorney on whose advice appellants allegedly relied:

BY MR. TAKIFF (Attorney for Ghitis):

Q. When Mr. Ghitis met with you, did he then indicate to you the type of business he was involved in?

A. Yes, he did.

Q. Mr. Fernandez, on behalf of Mr. Ghitis, as his counsel now, he waives all privilege that might exist with respect to attorney-client.

Did Mr. Ghitis discuss with you in any depth the kind of work that he was doing in particular?

MR. SHAPOS (the Prosecuting Attorney):

Objection, your Honor. That would be hearsay.

THE COURT:

The objection is sustained.

BY MR. TAKIFF:

Q. Did you speak with Mr. Ghitis about the kind of work he did?

A. Yes, I did.

Q. Did Mr. Ghitis indicate to you whether or not he was in the currency exchange business?

MR. SAPHOS:

Objection, your Honor; hearsay.

THE COURT:

The objection is sustained.

BY MR. TAKIFF:

Q. How long was your first meeting with Mr. Ghitis?

A. An hour, hour and a half.

Q. Subsequent to that meeting or during that meeting, did there come a time when Mr. Ghitis asked you your advice in terms of his requirement to file certain governmental forms?

\*　　\*　　\*　　\*　　\*　　\*

A. Well, in the manner that he explained to me the procedures that he

was following, how he was operating and the type of business that he was in, I expressed an opinion that I didn't feel that he had to file.

Q. Did he indicate to you, sir, that he was making deposits in a local bank?

A. Yes, he did.

Q. Did he indicate to you, sir, that—

THE COURT:

Counsel, please don't lead this witness. It's a lawyer; you don't have to lead him.

MR. SAPHOS:

Objection as to hearsay.

MR. TAKIFF:

Your Honor, if the Court please, this is, of course, a statement of the defendant.

THE COURT:

I don't care. You can't lead this witness. He is a lawyer; he doesn't have to be led.

MR. TAKIFF:

Yes, Your Honor.

Q. Please go on in your own words and tell the Court and jury what it is that Mr. Ghitis indicated to you his business was.

MR. SAPHOS:

Objection, your Honor; hearsay.

THE COURT:

The objection is sustained.

MR. TAKIFF:

Your Honor, would the Court hear me on that, sir?

THE COURT:

No.

BY MR. TAKIFF:

Q. What, if anything, did Mr. Ghitis tell you concerning currency exchange?

MR. SAPHOS:

Objection, your Honor, hearsay.

THE COURT:

The objection is sustained.

MR. TAKIFF:

Your Honor, if the Court please. Would you hear me on this?

THE COURT

No.[3]

BY MR. TAKIFF:

Q. What, if anything, did Mr. Ghitis indicate to you concerning his operations at the Capital Bank?

MR. SAPHOS:

Objection, your Honor, hearsay.

THE COURT:

The objection is sustained.

Record on Appeal at 371–75.

■ The Government now concedes that the trial court erred by sustaining the prosecutor's hearsay objections to defense counsel's questions about Ghitis' disclosure to his attorney. The lawyer's testimony was not offered as proof of the matter asserted—*i.e.*, that Ghitis and Eisenstein operated a currency exchange—but as evidence that Ghitis fully disclosed the nature of his business to his attorney. The testimony was admissible to show the attorney's knowledge and to show Ghitis' compliance with the "full disclosure" requirement of his advice of counsel defense. *See* Fed.R.Evid. 803(3); *cf. United States v. McLennan*, 563 F.2d 943, 945–47 (9th Cir. 1977), *cert. denied*, 435 U.S. 969, 98 S.Ct. 1607, 56 L.Ed.2d 60 (1978) ("When the defense is advice of counsel, the advice given, whether correct or not, and whether recitals in it are true or not, is always admissible.").

Perhaps it is unrealistic to suggest that the operators of a business exchanging nearly a quarter of a billion dollars in one eight-month period could be unaware of, or uncertain about, these reporting require-

---

**3.** The trial court missed its best opportunity to avoid its erroneous exclusion of the lawyer's testimony on hearsay grounds when it refused to permit defense counsel to explain this line of questioning. Had the judge heard counsel's explanation, the testimony might have come in and we would not today be required to reverse otherwise valid convictions.

ments. Nevertheless, in our system of American justice, a defendant must be allowed the opportunity to try to establish the suggested unrealism. The lawyer's testimony might not have been credible. Ghitis and Eisenstein might have been fanciful to argue their lack of knowledge about the reporting requirements. Still, the issue was one for the jury to decide on the presentation of all relevant evidence.

While it may stretch credulity to believe that anyone engaged in a business such as appellants' might not know of these reporting requirements, it is equally difficult to believe that the Government's prosecuting attorney was unaware of the relevance of the testimony sought to be elicited from Ghitis' attorney. In order for appellants to establish their good faith reliance on advice of counsel, it was *necessarily relevant* for the lawyer to tell the jury the nature of the enterprise presented to him by Ghitis and Eisenstein and upon which he gave his advice. It was of scant relevance that the lawyer might have told appellants that they were not required to file CTRs unless it also appeared that the lawyer had been fully advised of the operations of their business. Appellants were required to show that, as to this particular enterprise, the lawyer advised them not to be concerned about the CTRs.

█ The Government, although conceding that the lawyer's testimony should have been admitted, argues that any error was harmless because Ghitis testified as to the substance of his conversations with the lawyer and, in any case, because the attorneys for both sides argued to the jury as if Ghitis actually made a full disclosure. Hence, the government urges that the lawyer's testimony was merely cumulative of evidence already before the jury and that

appellants can show no harm resulting from the trial judge's ruling.

We are not convinced by the Government's "harmless error" argument.[4] As we have said, it might have been unrealistic to suggest that Ghitis and Eisenstein, operators of a business of this magnitude, relied in good faith on the advice of their attorney that they were not required to file these reports. However, even though it might be true that appellants would have been convicted for the lack of credibility of their only defense, the harm in having been denied such a defense is highlighted by the fact that, weak as it might have been, reliance on advice of counsel was appellants' only defense. The evidence of full disclosure, consisting entirely of Ghitis' unsupported testimony, could have been corroborated by his lawyer. The trial judge's failure to permit this highly relevant testimony cannot be dismissed as harmless error. Therefore, we reverse.

REVERSED.

---

4. If anything, the Government's "harmless error" theory illustrates how unwise it might have been for the prosecutor to have misled the judge into making this error. By keeping the lawyer's testimony from the jury, the prosecutor excluded evidence tending to support his theory that Ghitis and Eisenstein must have known about the reporting requirements. If the lawyer's testimony agreed with that of Ghitis, then from the extent of the disclosure made by Ghitis to the lawyer the prosecutor might have argued, and the jury might well have agreed, that appellants knew about the CTRs and realized that they were required to file such reports.