UNITED STATES of America, Plaintiff–Appellee,

v.

Elbert L. HATCHETT, Defendant–Appellant.

No. 89–1679.

United States Court of Appeals, Sixth Circuit.

Cause Argued Aug. 14, 1990.

Decided Nov. 7, 1990.

Kathleen Moro Nesi, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Detroit, Mich., for plaintiff-appellee.

William T. Coleman, III, Phyllis Golden Morey (argued), Pepper, Hamilton & Scheetz, Detroit, Mich., for defendant-appellant.

Before JONES and BOGGS, Circuit Judges, and GIBBONS,[*] District Judge.

BOGGS, Circuit Judge.

Elbert L. Hatchett appeals his conviction on four misdemeanor counts of willful failure to pay federal income taxes for tax years 1982, 1983, 1984, and 1986, in violation of 26 U.S.C. § 7203. On October 20, 1988, Hatchett was charged in an eight-count indictment with one count of tax evasion, in violation of 26 U.S.C. § 7201; one count of obstruction of tax collection, in violation of 26 U.S.C. § 7212(a); one count of concealment of property subject to levy, in violation of 26 U.S.C. § 7206(4); and five counts of willful failure to pay income taxes. After a month-long jury trial in February and March 1989, Hatchett was acquitted on the three felony counts and one misdemeanor count (failure to pay tax for 1985). The jury returned a guilty verdict on the other four counts, for which the court sentenced Hatchett to three consecutive one-year sentences. Hatchett also received one suspended sentence and was placed on five years' probation. Hatchett was also fined $100,000 ($25,000 on each count) and ordered to pay "all back taxes" as a condition of probation.

I

Hatchett is an attorney in the Detroit area who concededly began to fall behind in his tax payments in the 1970s. Audits conducted in the late 1970s by the Internal Revenue Service (IRS) revealed that Hatchett owed back taxes for tax years 1973–1977 in the amount of $107,454.14. On August 23, 1978, he entered into an installment agreement with the IRS, whereby he would pay the government $750 per week—$500 for his 1978 estimated tax payments and $250 for his delinquent taxes. From 1979 through 1986 (with the exception of tax year 1985), Hatchett submitted tax returns without any accompanying payment at all; he also failed to make any estimated tax payments during those years.

Hatchett claims that he consulted with an attorney, Frank Gettleson, on several occasions in 1979 and 1980 in order to consider different ways of handling his tax problems. He claims that Gettleson advised him to file returns that were then overdue but to withhold payment until he was able to negotiate with the IRS a consolidated payment schedule for all taxes. Hatchett thereafter filed a timely return for tax year 1979 on April 14, 1980, but without accompanying payment. He filed a late return for tax year 1980 on April 14, 1982, the same day he filed his 1981 return. Neither the 1980 nor the 1981 return included payment.

On August 26, 1980, Hatchett wrote to the IRS to inform it that he wished to make a lump-sum settlement or, alternatively, to pay $1000 per month until his liability was liquidated. Hatchett claims that the IRS did not respond to his letter, but he nevertheless began sending $1000 monthly payments. He stopped making these payments when, on January 21, 1981, the IRS seized and sold certain real property owned

[*] The Honorable Julia Smith Gibbons, United States District Judge for the Western District of Tennessee, sitting by designation.

by Hatchett. In March 1983, Hatchett again wrote to the IRS to request an installment payment plan; he claims that he received no response. The government, however, claims that Hatchett received a written reply in April 1984, informing Hatchett that he owed a total of $847,-780.46 ($827,791.96 in income taxes, interest, and penalties, and $19,988.50 in business taxes).

The government introduced evidence that during the period covered in the indictment, Hatchett was earning large sums of money from his cases. He settled one case that resulted in $900,000 in legal fees. The government claims that Hatchett converted these monies so as to make it impossible for the IRS to levy on them. He typically exchanged his clients' checks for a series of cashiers' checks; when the IRS levied on his bank accounts, it discovered that no funds were available to satisfy the levies. He also used the money to purchase goods in other people's names. In March 1983, Hatchett paid $28,447.12 in cash for a Porsche 911 for his son. He contemporaneously spent large sums on the construction of a boxer training camp for his son in Otter Lake, Michigan. In May 1983, Hatchett bought $113,744.20 worth of car washing equipment for a business called Sparkle Car Wash, which he held in the name of his elderly father. In 1985, Hatchett purchased a foster care home in his wife's name for $100,000 cash.

In April 1984, Internal Revenue Agent Christine Gibson, newly assigned to Hatchett's case, reviewed his assets and a list of court cases in which he was involved, so that the IRS might attach any attorney's fees due him. Gibson then prepared a list of over 300 levies to be served on Hatchett's clients, opposing counsel, and insurance companies, directing that any monies owed to Hatchett be paid to the IRS.

On June 11, 1984, Agent Gibson met with Hatchett to discuss whether he was prepared to make payment on his taxes owed. When Hatchett was unwilling to disclose any financial information, Gibson served Hatchett with a summons to produce all documents regarding his assets. Gibson testified that Hatchett told her at the June 11 meeting that "he wanted to pay and he always planned to pay his taxes." Gibson also testified that her notes of a June 22, 1984 follow-up telephone conversation with Hatchett indicated that she believed he was "making moves to pay."

On July 13, 1984, Hatchett met with Gibson to review the documents requested by the summons. At this meeting, however, Gibson never looked at any of the documents Hatchett provided. At this meeting, Gibson and Hatchett discussed a number of possible payment plans that could assist Hatchett in discharging his tax liability. After this meeting, not having reached an agreement with Hatchett about a payment plan, Gibson began serving the 300 levies she had prepared. *See United States v. Var–Ken, Inc.*, 875 F.2d 868 (6th Cir.1989) (unpublished per curiam) (reversing a summary judgment against the government in an action to enforce a levy and foreclose on funds assertedly owned by Hatchett).

Throughout 1985, Hatchett made several payments toward his tax debt totalling $80,000. He discontinued his $5000 weekly payments on September 23, 1985, when the IRS seized his Rolls Royce.

Hatchett reported adjusted gross income for 1982 of $329,940 and a tax due of $98,789. He filed this return, without payment, on March 7, 1984, nearly one year late.

Hatchett reported adjusted gross income for 1983 of $755,977 and a tax due of $336,799. He filed this return, without payment, a year late on April 15, 1985.

Hatchett reported adjusted gross income for 1984 of $307,410 and a tax due of $132,145. He filed this return, without payment, on April 15, 1985.

Hatchett reported adjusted gross income for 1985 of $400,788 and a tax due of $158,360. He filed this return, without payment, on April 15, 1987. On an amended return, he reported an adjusted gross income for 1985 of $571,437 and a tax due of $244,183. He filed this return, with a

total payment of $100,000, on April 7, 1988, two years late.

Hatchett reported adjusted gross income of $445,535 for 1986 and a tax due of $195,699. He filed this return on April 8, 1988, one year late and without payment.

Hatchett raises eight assignments of error: one concerning the jury selection process, four concerning evidentiary rulings, and three concerning his sentencing. We consider them in that order.

## II

Hatchett's first claim is that the government exercised its peremptory challenges during jury selection in a racially discriminatory manner. We find no merit in this claim.

The jury consisted of three Blacks and nine whites. The record indicates that the jury venire consisted of 70 people. Fifty-five identified themselves as white, 14 as Black or Negro, and one as Asian. The prosecution was given six peremptory challenges, while the defense had ten. Each side had one additional peremptory challenge that could be exercised only against an alternate juror. The district court ruled that if a party chose to pass on the exercise of a peremptory challenge, then that peremptory was lost.

Hatchett claims that the procedure by which the government exercised—or waived—its peremptories was racially motivated and discriminatory. The original jury panel drawn contained eleven whites and one Black. The government used its first peremptory to strike the only Black juror. That juror has a son who had been criminally charged in June 1988; she also had recently been audited. After the government excused the Black juror, she was replaced by a white juror.

The government then waived each of its peremptories against remaining white jurors. Hatchett claims that the government had stronger cause to excuse several of the white jurors than it did to excuse the lone Black juror. During voir dire, for example, it came out that several of the eleven original white jurors had encounters with the

government that were allegedly more unpleasant than the Black juror's. One was audited in 1980, and he admitted to the court that he wasn't "thrilled about paying [his] taxes." Another had fallen behind in his taxes five years before the trial and had to make payments over a three-year or four-year period. A third had been arrested for drunken driving in October 1985. One of the alternate jurors, a white woman, had been audited in January 1989, one month before the trial began. Hatchett claims that the reason the government did not excuse any of these white jurors was because it did not want to risk impaneling a Black replacement juror from the venire.

While the government waived each of its first four peremptories against the remaining jurors, the defense exercised each of its first four peremptories to excuse a white juror. Each was replaced by a white juror. After the government waived its fourth peremptory, the defense requested a conference outside the presence of the jurors. Hatchett, whom the court had permitted to participate in the presentation of his case, made the following appeal to the court:

> It seems the impact of what the Government is doing, although she has a perfect right to do it, is negate our potential of having a certain number of black people on the jury to try me and my wife. We are entitled to a fair selection of people to sit in judgment of us, a part and parcel would be a group of people who have a peculiar identity with me. The fact that the Government has chosen to pass peremptorily on challenges means that it reduces the prospect of it reducing any of those persons by 50 percent. The only peremptory she has offered has been a challenge to disqualify a black juror, that's the only time she's exercised her prerogative to summarily remove a juror, that juror is black. You have held us tightly with respect to how many challenges we can have.... [T]he Court should mitigate the harm to me and my wife by giving us more challenges. We have ten black people left on the jury panel and we have none seated except an alternate and, judge, we are not going to have any representatives of the black

race on this jury if the prosecution is permitted to persist in her exercise of her prerogative of not peremptorily challenging anybody.

The government offered to have an *in camera* hearing with the court to explain the reasoning behind its jury selection procedure. The defense had no objection.[1] In chambers, the assistant United States attorney explained to the court her reason for excusing the Black juror and no other: only the Black juror had recently had an experience in criminal court and been audited. The other jurors' experiences were considerably more remote, and thus they were less likely to harbor resentment against the IRS. The court was satisfied by the prosecutor's explanation, and found that the government's juror selection process was not tainted by racial discrimination.

The jury selection process then continued, and the government exercised no other peremptory challenges.[2] After the defense exercised its peremptories and several other jurors were excused for cause, additional jurors were impaneled and the final jury consisted of three Blacks and nine whites.[3]

Hatchett argues that it was pure fortuity that three Blacks were impaneled on the final jury, and that this end result does not render moot the constitutional issue of the government's allegedly discriminatory selection process. Hatchett claims that the *withholding* of peremptory challenges violated his fourteenth amendment right to be free from discriminatory jury selection procedures, as stated in *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986): "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." [4]

The *Batson* Court enumerated three elements of a prima facie case of purposeful discrimination. First, the defendant must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact "that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" Third, the defendant must show that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." 476 U.S. at 96, 106 S.Ct. at 1723 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892–93, 97 L.Ed. 1244 (1953)). Once the defendant has made out a prima facie case, the burden shifts to the government to come forward with a neutral explanation for challenging Black jurors. *Ibid.* Hatchett argues that he has made out a prima facie case of discrimination and that the prosecutor's apparently neutral explanation is invalid.

■ Hatchett claims that the prosecutor's reasons for striking the Black juror were equally applicable to similarly situated white jurors, and thus the prosecutor's explanation was pretextual. In such a case, the prosecutor's explanation does not withstand scrutiny. *Garrett v. Morris*, 815 F.2d 509, 513–14 (8th Cir.), *cert. de-*

1. After the court announced the result of the *in camera* meeting, however, the defense did object to the court's holding a hearing *in camera.*

2. The government did use its one available peremptory challenge for alternates to strike a Black alternate juror, who was replaced by the Asian juror.

3. Although Hatchett claims in his brief that the jury consisted of ten whites and two Blacks, all other indications are that the jury consisted of three Blacks, and Hatchett's attorney so agreed at trial. (The defense had questioned whether one juror was Black or Asian–American, but she listed herself as Black on her jury questionnaire.)

4. Since this was a federal trial, the fourteenth amendment, to which Hatchett appeals, is not implicated. Rather, Hatchett should be pursuing his claim under the fifth amendment. *See United States v. Sangineto–Miranda*, 859 F.2d 1501, 1519 (6th Cir.1988).

*nied*, 484 U.S. 898, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987).

We see no clear error in the court's determination that the circumstances of the white jurors who were not challenged differed from those of the two Blacks who were excused.[5] The only white juror who had been audited was audited in 1968. This remoteness of his audit was an important distinction. Another white juror had fallen behind in his tax payments five years earlier, but there was no evidence that he had been audited or had had a bad experience with the IRS. The government exercised its one peremptory challenge reserved for the alternate jurors against the Black alternate rather than against the white alternate because the Black alternate had been a client of Hatchett. Although the white alternate had been audited one month before trial, there was no indication that her audit did not proceed favorably; the government saw the Black alternate as a greater risk to impartiality, for reasons apart from her race.

■ Furthermore, we find that Hatchett did not establish a prima facie case under *Batson*. All of the attendant circumstances do not raise an inference that the prosecutor excluded Blacks from the jury on account of their race. In *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1521–22 (6th Cir.1988), we reasoned:

> If, after the jury selection process has ended, the final jury sworn has a percentage of minority members that is significantly less than the percentage in the group originally drawn for the jury (or in the whole jury pool or in the district), then that would be a factor pointing toward an inference of discrimination. If, on the other hand, the percentage of minority members in the ultimate jury is the same or greater, that would be a factor tending to negate the inference of discrimination.

In this case, the jury pool of 70 contained 14 Blacks (20%). The final jury consisted of three Blacks and nine whites (25% Black).

Furthermore, the district court credited the prosecutor's explanation for her pattern of striking or not striking certain jurors. The Supreme Court has ruled that findings of no intentional discrimination turn largely on an evaluation of credibility, which we as a reviewing court should accord great deference. *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 no. 21.

■ Contrary to Hatchett's implication, he is not entitled to a jury composed largely of members of his race. In *Batson*, the Court ruled "that a defendant has no right to a 'petit jury composed in whole or in part of persons of his own race.'" 476 U.S. at 85, 106 S.Ct. at 1716 (quoting *Strauder v. West Virginia*, 100 U.S. 303, 305, 25 L.Ed. 664 (1880)). Rather, the defendant has a right "to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." *Ibid*. Because Hatchett was tried before a fairly selected jury, we deny his claim of racial discrimination.

### III

### A

■ Hatchett next assigns as error the exclusion, during direct examination of Frank Gettleson, of testimony by Gettleson about statements allegedly made by Hatchett to Gettleson about his tax troubles. The defense called Gettleson to testify about the tax advice he gave Hatchett in 1979 and 1980. When Hatchett's trial counsel asked Gettleson to explain to the jury the content of a conversation Hatchett had with him in 1980, the government objected that the answer would be hearsay and would be irrelevant. The district court sustained the objection, apparently on the ground of hearsay, and precluded Gettleson from testifying about any disclosures Hatchett made to him.[6] Hatchett now

---

**5.** The other Black who was excused was an alternate. The prosecutor tried to convince the court to strike the alternate for cause because she was one of Hatchett's former clients. When the court refused, the government exercised against her its one peremptory challenge reserved for alternatives.

**6.** The court found that the testimony was offered to prove the truth of the matter asserted.

claims that the district court improperly excluded Gettleson's testimony, which was crucial to Hatchett's defense that he relied on the advice of counsel in withholding tax payments. He argues that the court's ruling improperly made proof of the "advice of counsel" defense difficult.

Hatchett argues on appeal that the testimony Gettleson would have provided would not have constituted hearsay because it would not have been offered for the truth of the matter asserted.[7] F.R.E. 801(c). The statements would have concerned disclosures that Hatchett made to Gettleson about his tax liabilities as of 1980. Hatchett claims that this testimony was offered not to prove the truth of the content of Hatchett's statements about his tax situation, but rather to prove that Hatchett made a full disclosure of all pertinent facts to Gettleson. Hatchett claims that the court prevented the jury from accepting Hatchett's advice of counsel defense, by disabling it from determining whether Hatchett made a complete disclosure to Gettleson. Hatchett argues that the testimony was not offered to prove its truth, but rather so that Hatchett could comply with the full disclosure requirement of his defense. *See United States v. Eisenstein,* 731 F.2d 1540, 1545 (11th Cir.1984).

Hatchett declined to testify. Gettleson's testimony, therefore, was allegedly the only vehicle for getting Hatchett's advice of counsel defense before the jury.[8] Hatchett thus contends that the exclusion of this testimony completely deprived Hatchett of his right to make out a defense.

We hold that the district court did not abuse its discretion in refusing to admit Gettleson's proffered testimony regarding Hatchett's disclosures to him. The district court, in denying Hatchett's motion for bond pending appeal,[9] noted that

> [a]lthough attorney Gettleson's testimony may have been admissible for the limited purpose of showing defendant made a disclosure, it was not admissible to prove the facts constituting the disclosure. The advise [sic] of counsel defense requires not only evidence of disclosure, but also evidence that the facts disclosed are relevant.... The relevance of the facts disclosed could only have been determined *had the jury considered as truthful* the out-of-court statements which attorney Gettleson was asked to recite.
>
> Had defense counsel represented to the Court the evidence of the factual basis underlying the disclosure would be tied in through a different witness, or asked that the statements be admitted for the limited purpose of showing disclosure and with a cautionary instruction to the jury, this Court's ruling may have been different. However, no such request or representation was made.

(Emphasis supplied.) Having determined that Gettleson's testimony was offered to prove the truth of Hatchett's out-of-court disclosures, and in the absence of a proffer by Hatchett's counsel of other evidence that could prove the truth of the disclosures, the court properly ruled that Hatchett's declarations came within the definition of hearsay and were inadmissible

We find that the court's ruling could not have undermined the jury's ability to determine the strength of the advice of counsel defense. The defense managed to get the substance of Hatchett's statements to Gettleson before the jury by other means. Although the court sustained the government's objection to the question asking

---

**7.** Upon the government's objection, Hatchett's counsel initially conceded that the testimony she was trying to elicit would be hearsay.

**8.** This argument collapses under the weight of its own logic, however, because the fact that Gettleson, not Hatchett, was the vehicle for getting the statements before the jury is what distinguishes *Eisenstein.* In *Eisenstein,* the court admitted the lawyer's testimony because it was not offered to prove the truth of the matter

asserted. A codefendant had already related the matters disclosed, and the lawyer's recounting of the disclosures was not needed to prove their truth. By contrast, the jury in this case would have been induced to accept the truth of the matters disclosed by Hatchett when *Gettleson* testified to them.

**9.** On June 15, 1989, a panel of this court reversed the order denying bond pending appeal.

Gettleson directly what Hatchett told him, Gettleson nevertheless testified to several disclosures by Hatchett:

—Hatchett"tried to pay the tax and apparently met with some opposition in that regard;"

—"he couldn't pay it all at one time and it was a fair amount of money at that time and he was going to try and make some orderly payments;"

—Hatchett owed "probably one hundred seventy-five to two hundred thousand, something in that area;"

—"I knew he had been audited incessantly prior to that time;"

—"I knew he had made payments, he had made some payments along the way;"

—"he was concerned if there would be any other ramifications, such as criminal ramifications, that may befall him."

On cross examination, Gettleson admitted that:

—he did not know exactly when Hatchett had been on an installment payment program;

—he did not know that the installment payment program was stopped at the end of 1978 because Hatchett was bouncing checks;

—he did not know that Hatchett had failed to make estimated tax payments for the 1979 tax year;

—they "didn't really discuss" whether Hatchett would make current estimated tax payments in 1980;

—Hatchett never told him whether the IRS had required Hatchett, as a condition of the installment payment program, to remain current with his estimated tax payments.

This testimony was sufficient for the jury to determine whether Hatchett had made a full disclosure to Gettleson of all pertinent facts.

Furthermore, nothing said in closing arguments could have confused the jury as to Hatchett's advice of counsel defense. The government did not claim that Hatchett's defense must fail because there was no proof of full disclosure (proof, Hatchett would argue, that was impermissibly kept from the jury). The government simply argued, in its initial closing and in its rebuttal closing, that the advice of counsel defense should not protect Hatchett prospectively, because Gettleson never explicitly advised Hatchett not to pay taxes from 1981 to 1986. Hatchett in turn argued in his closing that "[Gettleson did not] have to tell me not to pay in '81, '82, '83, he already told me that when I sat down and talked to him." At no point was the jury misled either as to the elements of an advice of counsel defense or as to the quantum of proof necessary to find "willfulness" in Hatchett's failure to pay. Under these circumstances, we find no abuse of discretion in preventing Gettleson from testifying directly as to the truth of Hatchett's disclosures.

B

■ Hatchett next contends that the district court abused its discretion by precluding attorney Gettleson from explaining the legal authority for the advice he gave Hatchett. The government objected to the proffered testimony on the ground that the witness would be testifying to the jury about legal issues. The court limited Gettleson's testimony to statements about the general legal authority on which he relied in advising Hatchett, "without going into any specifics."

Hatchett asserts that the testimony would have proved that Gettleson conducted specific research on the issue of withholding payment from the IRS in good faith. If Hatchett could have shown the jury that the legal principles underlying the advice upon which he relied were well established in the case law, he claims that he could have made out his advice of counsel defense. Moreover, Hatchett insists that Gettleson's testimony would not have invaded the court's province to instruct the jury on the applicable law. Gettleson's proffered testimony allegedly bore only on his competence in correctly advising Hatchett on the law, while the court retained the ultimate authority to instruct on the law.

We find no abuse of discretion in limiting Gettleson's testimony to statements about the general legal authority on which his advice rested. Testimony about the specific results of Gettleson's legal research was properly excluded. Before the government objected, Gettleson was able to testify that:

I did some research back at that time and I was confident in the research that I did, based upon the statute and based upon the case law that I found as a result of that research, that the position he had taken was a sound position and I told him as much. And I based it in part on the case of—

The court then sustained the government's objection that any further statements would constitute legal argument in front of the jury. The court did not, however, prevent Hatchett from proving that Gettleson was competent to give him sound advice. The court merely restricted the means by which Hatchett could present his argument, so as to limit jury confusion.

In *United States v. Curtis*, 782 F.2d 593, 599 (6th Cir.1986), we noted that witnesses "do not testify about the law because the judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to inform the jury about the law that is relevant to their deliberations." This rule is necessary to prevent the potential confusion that can arise if the law as presented by the witness conflicts with the law as instructed by the court. *Id.* at 600. Given the soundness of this rule, the district court did not abuse its discretion by excluding references to specific case law under the circumstances presented here.

## C

■ Hatchett also complains about the government's cross examination of one of Hatchett's law partners, Marvin Smith, who became an associate in Hatchett, Dewalt, Hatchett, Mitchell, Morgan & Hall in 1981 and a partner in Hatchett, Dewalt, Hatchett & Hall (of which Hatchett is managing partner) in 1983, testified at trial as to the nature of the law partnership. He further testified about Hatchett's efforts to obtain loans from the partnership in order to pay his taxes. On cross examination, the district court permitted the government to attempt to impeach Smith's credibility by questioning whether he himself had filed any income tax returns for tax years 1981–1986. Smith responded that he had not filed any such returns.

The defense objected to this cross examination on the ground of relevance. The prosecution argued that the questioning was relevant because it concerned the witness's bias. There had been extensive testimony about the partnership's dealings with the IRS, and this line of questioning was designed to illuminate the partners' general failure to cooperate with the IRS. The court was persuaded that the prosecution should be permitted to pursue this questioning, especially on cross examination.

Mr. Smith's cross examination was then continued to the next day. That next morning, before the jury entered the courtroom, the court entertained the defense's motion for a mistrial based on the previous day's cross examination of Smith. Although Hatchett had, on the previous day, objected to the prosecution's line of questioning only on the basis of Fed.R.Evid. 609 (Impeachment by Evidence of Conviction of Crime), the memorandum in support of the motion for a mistrial rested primarily on Fed.R.Evid. 608 (Evidence of Character and Conduct of Witness). Rule 608(b) states in pertinent part:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Rule 609 allows for impeachment only through evidence of a felony conviction.

Hatchett argues that Rule 609 did not apply to Smith, and Rule 608 was inapposite because Smith's failure to file timely returns did not relate to his character for truthfulness or untruthfulness. Thus, Hatchett contends, cross examination based on Smith's failure to file or to pay his taxes was inadmissible to attack his credibility. The defense requested that if the court was unwilling to grant a mistrial, it should at least give a curative instruction to the jury.

The court ruled:

I'm going to give them an instruction that the only purpose is to attack his credibility and that his tax problem or his failure to pay taxes is not an issue in this case. I'm not granting a motion for mistrial.

Hatchett's counsel and the court then engaged in this exchange:

[DEFENSE COUNSEL]: I would like to know whether the Court is making a specific finding that the activity elicited relates to [Smith's character for truthfulness or untruthfulness].

THE COURT: I'm saying the questions and the answers tend to bring out any interest or bias that this witness may have and that this bears upon his credibility and I believe that's fair cross-examination.

Hatchett's argument rests on the notion that the testimony permitted on cross examination was inadmissible because it was not relevant to Smith's character for truthfulness or untruthfulness. Hatchett claims that the court, in finding that Smith had "a motive to be untruthful," merely found that it would have been advantageous to Smith to give false testimony; the court did not, and could not, find that Smith had a reputation for being untruthful. The specific acts of not filing tax returns provided Smith a *motive* to lie, but did not shed light on his *character* for truthfulness. Hatchet insists that failure to file tax returns and pay taxes is unrelated to character for truthfulness or untruthfulness.

■ We agree with the district court that Smith's failure to pay taxes was clearly probative of his credibility. Hatchett does not disagree that the government's cross examination of Smith was intended to show bias; he merely contends that evidence of bias is not an attack on credibility. However, a showing of bias is designed to attack a witness's credibility. *See, e.g., Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) ("A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness"). This rule is sound because evidence of bias allows jurors to draw appropriate inferences about the reliability of the witness. *See United States v. Smith*, 831 F.2d 657, 662 (6th Cir.1987) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (quoting *Davis*, 415 U.S. at 318, 94 S.Ct. at 1111)), *cert. denied*, 484 U.S. 1072, 108 S.Ct. 1044, 98 L.Ed.2d 1007 (1988). An attack on a witness's credibility by demonstrating bias is permissible under Fed.R. Evid. 608(b)(1) precisely because it goes to the witness's character for truthfulness.

The impeachment testimony in fact confirmed Smith's bias by revealing a common pattern of activity with Hatchett: flouting the tax laws by not filing returns or paying taxes when they were due. Smith's behavior was directly relevant to his credibility, and his testimony was admissible.

D

■ Hatchett's next claim is that the district court abused its discretion by excluding from evidence a videotaped segment from a "60 Minutes" television broadcast that focused on the collection techniques of a local IRS office. During his cross examination of IRS agent Robert Bednarczyk, Hatchett attempted to show the videotape in order to convince the jury that IRS agents used oppressive collection tactics. The government objected on relevance grounds, noting that the television show was broadcast in 1981 and made reference to matters not in evidence, and on hearsay grounds. The court ordered defense counsel to proceed to another topic of

examination until the court had viewed the tape and ruled on its admissibility. Two days later, the court issued a ruling denying Hatchett's request to show the videotape.

The court found that the tape was "classic hearsay." It did not "know how the Government can possibly cross-examine anything on this film. In addition ... [t]he incidents in this case involve actions subsequent to 1981. I find it first of all hearsay and, second of all, not relevant."

Hatchett claims that the court's ruling deprived him of his right effectively to cross examine a government witness. He contends that the tape was not hearsay because it was not offered for the truth of its contents, but only to test the witness's conclusion that Hatchett's failure to file a joint return for him and his wife was unusual. Hatchett intended to show that it would have been reasonable for a person to forego the financial benefits of a joint return (as compared to separate returns) in exchange for security from the reputedly unreasonable actions of the local IRS division. Hatchett also disputes the finding that the tape was irrelevant. Although the tape referred to IRS collection procedures in 1981, the government's expert was able to testify on direct examination about tax years 1979–1982. The 1981 broadcast, by comparison, was not too remote to be relevant.

We again find that the court did not abuse its discretion by making this evidentiary ruling. Despite Hatchett's assertion that he did not intend to offer the videotape for the truth of its contents, there were no other facts in evidence by which to judge its truthfulness. No independent evidence had been admitted to prove the truth of the allegations made in the "60 Minutes" segment. In cross examining the government's witness on his opinion that Hatchett's not filing a joint return was unusual, Hatchett needed a basis for his explanation that he was attempting to avoid the alleged pressure tactics of the

IRS. This basis lay only in the videotape; its truthfulness would have to have been assumed by the jury in order for Hatchett's proffered explanation to have had any validity. Furthermore, there was no way for the government to detect whether the tape had been altered, and the government would have been unable to challenge the accuracy of the broadcast. Under these circumstances, the court did not abuse its discretion in excluding this evidence.

## IV

### A

▮▮▮ Hatchett contends that the court violated Fed.R.Crim.P. 32(c)(3)(D) by not adequately addressing his allegation that the presentence report contained a factual inaccuracy. He argues that the court neither made a finding as to the truth of the allegation, as required by Rule 32(c)(3)(D)(i), nor made a determination that no such finding was necessary because the matter would not be taken into account in sentencing, as required by Rule 32(c)(3)(D)(ii). Hatchett insists that the court's failure to comply strictly with the rule requires us to remand for resentencing.

The alleged error in the presentence report relates to the applicability of parole guidelines. (Hatchett was not sentenced under the Sentencing Guidelines, since the court determined that the criminal activity charged in the indictment was completed before the effective date of the guidelines.) The probation officer estimated, according to the Parole Commission's guidelines, the amount of time that Hatchett would serve in prison before being released on parole. Hatchett claims that the parole guidelines computation was inaccurate, and that the court relied on this erroneous presentence report.[10]

The parole calculations are not a part of the sentence imposed by the court. Parole release is an administrative determination, separate from the imposition of a term of

---

**10.** The court actually stated: "I've had an opportunity to review this file, I've had an opportunity to review my notes, I've had an opportunity to preside over this case and I've had an opportunity to review the presentence report...."

imprisonment. Furthermore, the parole guideline worksheet states that it is an estimate and that it has no binding effect, either on the sentencing judge or on the Parole Commission. The district court adequately responded to Hatchett's argument at the sentencing hearing:

> THE COURT: What are you asking me to do with the guidelines? They're the guidelines of the parole commission, not this Court.
>
> [DEFENSE COUNSEL]: However, they have been made a part of the probation officer's report. We believe they are inappropriate because they do not apply to misdemeanor offenses. We would ask the Court to disregard completely the parole guidelines assessment because we don't believe they apply.
>
> THE COURT: Okay.

The court agreed it would disregard the contested information. No due process violation resulted, since the court ignored the alleged error in the report. In addition, Rule 32(c)(3)(D) was not violated by the absence of a written record. The rule only concerns factual inaccuracies, not calculations explicitly labelled "estimates" that are irrelevant to sentencing.

### B

■ Hatchett's next contention regarding his sentencing is that the court should have required the jury to specify in its verdict whether his offenses were completed prior to November 1, 1987, the date the Sentencing Guidelines became effective. If the offenses that underlay the jury's guilty verdict were not completed before November 1, 1987, then Hatchett contends that he should have been sentenced under the guidelines, not under the statute, relying on *United States v. Sams*, 865 F.2d 713, 715 (6th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 3187, 105 L.Ed.2d 695 (1989). Hatchett claims that it was plain error for the court to fail to secure a specific finding from the jury as to the completion date of the offenses.

Hatchett alleges that confusion was caused by the government's introduction of evidence that extended into 1987. There was evidence of Hatchett's expenditures on such luxury items as furs and automobiles as late as 1987. There was evidence of substantial legal fees earned by Hatchett as late as December 1987. Hatchett claims that if the jury found that his willful act of non-payment extended beyond November 1, 1987, then the court erred by not sentencing him under the guidelines.

We note that *United States v. Sams* does not support the proposition Hatchett suggests. The issue in *Sams* was not whether the crime had been completed before November 1, 1987 for guidelines purposes, but rather whether the crime had extended into the time prosecution was statutorily permitted. In *Sams,* we concluded that the failure to instruct the jury to specify the date on which the defendant's failure to pay his taxes became willful was not plain error, since the jury *could* have concluded that every element of the crime occurred within the time prosecution was permitted. 865 F.2d at 716.

■ Hatchett's claim is foreclosed in any event because he did not object to the absence in the jury instructions of a request for a specific finding as to the date on which the crimes were completed. As we held in *Sams:*

> Sams did not object at trial to the jury instructions given by the district court. Thus, the issue of whether the court *should* have instructed the jury to specify the date on which Sams's failure to pay taxes became willful is not before us. Fed.R.Crim.P. 30.

865 F.2d at 716 (emphasis in original). Where a party fails to object at trial, reversal is required only in those exceptional circumstances where necessary to avoid a miscarriage of justice. *United States v. Hook,* 781 F.2d 1166, 1172 (6th Cir.) (citations omitted), *cert. denied,* 479 U.S. 882, 107 S.Ct. 269, 93 L.Ed.2d 246 (1986). As this is not such an exceptional case, we decline to overturn the sentence.

### C

Hatchett's final contention is that the district court erred by conditioning probation on the payment of "all back taxes"

during the period of probation. He argues that this condition demands restitution based on counts in the indictment of which he was acquitted.

Hatchett notes that 18 U.S.C. § 3651 permits a court to order restitution as a condition of probation, but only for those counts on which a defendant has been convicted. Hatchett was convicted only on the misdemeanor counts of failure to pay taxes in 1982, 1983, 1984, and 1986. He was acquitted on the tax evasion counts and for failure to pay taxes for 1985. Hatchett argues that the court was limited to ordering restitution for amounts included in the four misdemeanor counts on which he was convicted. He therefore demands resentencing.

We find no abuse of discretion in the district court's order. The district court did no more than insist that Hatchett comply with the law as a condition of probation. The order should be interpreted as being limited to obligations that either have gone to judgment or are otherwise legally owed. The order cannot be taken to require the payment of tax debts that are legitimately in contest.

 The order need not be limited to amounts owed for the years for which Hatchett was convicted. The payment of tax debts for other years that have been reduced to judgment or are due under 26 U.S.C. § 6151 is an appropriate condition of probation, since such debts represent definite legal obligations.[11] *See United States v. Taylor*, 305 F.2d 183, 188 (4th Cir.), *cert. denied*, 371 U.S. 894, 83 S.Ct. 193, 9 L.Ed.2d 126 (1962) (the court may require, "as a condition of probation, the payment of all taxes and penalties lawfully determined to be due and collectible"). *See also United States v. McMichael*, 699 F.2d 193, 195 (4th Cir.1983) (the court may order the defendant to repay taxes "whenever the amount ... is legally determined"); *United States v. Vaughn*, 636 F.2d 921 (4th Cir. 1980) (recognizing that conditioning proba-

tion on the payment of "all taxes, interest, and penalties presently owed to the Internal Revenue Service" is proper, but vacating the order that probation be further conditioned on reimbursing the government for the expenses of investigating the offense).

Contrary to Hatchett's contention, the district court's order was not one for restitution under 18 U.S.C. § 3651. Therefore, conditioning probation on the payment of "all back taxes" was not an abuse of discretion. As in *Taylor*, the court could properly require "payment of those taxes reported ... since such liability is admitted." *Id.* at 187. In addition to those taxes "shown by the defendant's returns to be due," the court may condition probation on the payment of those taxes found by the jury to have been willfully not paid. *Id.* at 188. Nothing in the probation conditions should be interpreted to prevent Hatchett from contesting, in good faith, any proposed assessment.

For the foregoing reasons, the conviction is AFFIRMED.

NATHANIEL R. JONES, Circuit Judge, dissenting from Parts III(A) and IV(C).

## I.

In Part III(A) of its opinion the majority holds that evidence offered by Frank Gettleson, Hatchett's former tax attorney, as to disclosures made by Hatchett when he sought legal advice for his tax difficulties was properly excluded as hearsay. As this testimony was vital for establishing the essential disclosure element of Hatchett's advice of counsel defense and the trial judge's improper exclusion of this evidence made proof of the advice of counsel defense substantially more difficult, I would reverse and remand.

Hatchett contends that the testimony was not offered for its truth, but instead to prove that certain disclosures were in fact

---

**11.** Section 6151 provides: "When a return of tax is required under this title or regulations, the person required to make such return *shall*, without assessment or notice and demand from the

Secretary, ... pay such at the time and place fixed for filing the return...." (Emphasis supplied.)

made. Hatchett cites in support of his position *United States v. Eisenstein*, 731 F.2d 1540, 1545 (11th Cir.1984), which in circumstances very similar to this case holds that testimony of defendant's lawyer relating to disclosure by defendant was improperly excluded as hearsay because it was offered to demonstrate the lawyer's knowledge and that defendant disclosed.

The majority holds that Gettleson's testimony as to Hatchett's disclosure was properly excluded by the trial judge as hearsay offered for the truth of the matter asserted. In reaching this conclusion, the majority has conflated two issues: first, whether the evidence was offered to demonstrate that defendant disclosed his tax situation to his attorney; and secondly, whether the content of that disclosure was true.

In answer to the first issue, there is no requirement that a litigant supply corroborating testimony in order to demonstrate that he is putting on evidence to show that certain statements were in fact made. It would be perfectly legitimate for Gettleson to testify to the fact that certain statements were made to him. The jury would then decide whether *Gettleson* told the truth as to the fact that the statements were made. Whether or not the statements themselves were true or not raises a wholly separate inquiry. Presumably, if Gettleson testified to Hatchett's disclosure, Hatchett would still need to produce evidence that he disclosed accurate and truthful information to Gettleson. *But he need not do so with the same witness.* Whether or not Hatchett ultimately put on enough evidence for the jury to infer that he had made out his advice of counsel defense has no bearing on the propriety of the trial judge's ruling on the admission of Gettleson's testimony. The appropriate procedure would have been for the trial judge to admit the testimony and give proper limiting instructions at the close of trial if they seemed appropriate.

The majority seems to place great weight on the fact that Hatchett did not testify to the matters disclosed and therefore assert their truth. The majority suggests that if Hatchett had testified, or put on other evidence that went to the truth of the disclosure he made to Gettleson, then Gettleson's statements that disclosure was made would only go to the fact of disclosure. But this argument is circular. Presumably, if the defense put on Hatchett to testify as to his conversations with Gettleson, this testimony would have been objected to as hearsay on the same grounds as Gettleson's. The defense would then have been required to corroborate Hatchett's testimony with other evidence as to the truth of his disclosure statements. The logical witness to corroborate Hatchett would be Gettleson But then, that is where we started.

The fact of the matter is that the trial judge precluded Hatchett from putting on evidence which was essential to his only defense: advice of counsel. It was for the jury to decide whether the facts disclosed were accurate based upon a comparison of the record to the alleged disclosures to Gettleson. In order to put on Gettleson's testimony as to disclosure statements made to him by Hatchett, the defendant was not required to offer support for the truth of the disclosures independent of the facts in the record concerning the amount of his tax liability, the filing of returns, the audit, etc. The trial court and the majority are in error in ruling that independent confirmation of the truth of a statement is required when that statement is not offered for its truth.

As the exclusion of this testimony went to the heart of Hatchett's defense and therefore, to the heart of the fairness of his trial, I would reverse.

## II.

I also disagree with the court's analysis and conclusions in Part IV(C) of its opinion. In that section, the majority holds that the trial court did not abuse its discretion when it made Hatchett's payment of "all back taxes" (not only those owed on indictments for which he was convicted), a condition for Hatchett's probation. The majority reasons that it was legitimate for the trial judge to include in his conditions for Hatchett's probation that Hatchett pay back taxes even on those counts for which

he was acquitted because these debts represented "definite legal obligations."

The majority's reasoning here seems to me to be faulty. The fact that defendant has outstanding legal obligations unrelated to those offenses for which he was convicted should have no bearing on defendant's probation relating to his convictions. For example, it certainly would not be appropriate for the trial court to condition probation from a criminal offense on the defendant's paying his rent or his credit card debts. The absurdity and inherent danger of allowing trial courts to condition probation on the payment of debts unrelated to a defendant's convictions merely because they represent "definite legal obligations" seems clear.

In *United States v. Green*, 735 F.2d 1203, 1205 (9th Cir.1984), the district court sentenced Green to three years probation for failure to file returns for the years 1975–77, on the condition that Green pay all back taxes due and owing. The Ninth Circuit ruled that the district court had overreached its authority stating that, "In criminal tax cases, the court may order restitution only of back taxes for the years involved in the conviction." *Id.* I agree with the Ninth Circuit's conclusion and would reverse in this case as the district court only had the authority to order restitution for the tax years in which Hatchett was convicted of a tax crime.

Such a rule makes sense not only out of basic fairness to the defendant, but also because an order to pay "all back taxes" may place an obligation on the defendant which exceeds the term of the probation and hence the court's jurisdiction over the case.

> 'Normal' criminal restitution remains within the equitable power of the judge who orders it; he can modify his order (or at least refuse to revoke probation for failure to comply) if the circumstances of the defendant change. When the court purports to order a particular schedule of payment extending beyond the period of the court's jurisdiction, however, the opportunity for equitable adjustment ceases.

*United States v. Bruchey*, 810 F.2d 456, 460 (4th Cir.1987). Applying this reasoning in interpreting the Victim and Witness Protection Act, 18 U.S.C. §§ 3579 and 3580, the *Bruchey* court reversed the district court's conditioning defendant's 5 year probation on signing a promissory note for payment of restitution of embezzled funds over a 21 year period. While the Victim Act is not at issue here, the rationale seems apposite: the court may not order restitution which exceeds the term of probation. While the district court in the case at bar made no findings as to Hatchett's ability to pay the "restitution" ordered, it would appear given Hatchett's tenuous financial circumstances and the prior payment arrangements he negotiated with the Internal Revenue Service, that the court's order to pay "all back taxes" will involve payments beyond the 5 year probation. Thus, in addition to exceeding its authority by conditioning Hatchett's probation on the payment of debts unrelated to the convictions, the district court exceeded its authority by ordering restitution which will in all likelihood extend beyond the probation period.

I recognize that the government has an interest in recovering back taxes but it may not do so by tacking on debts unrelated to a criminal defendant's conviction by making their payment a condition of probation for offenses for which the defendant was convicted. A defendant's sentence must relate only to the crimes for which he was convicted. By allowing the government to include payment for acquitted offenses in a sentence for convicted ones, the court today unsettles this time-honored principle.

### III.

For the foregoing reasons I respectfully dissent.