935 F.2d 271
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Anthony GLYNN (90-1250), Reginald Van harrell (90-1251),
Kenneth Henderson (90-1252), Defendants-Appellants.
 90-1250 to 90-1252.
 United States Court of Appeals, Sixth Circuit.
 June 18, 1991.
 
 Before RALPH B. GUY, Jr. and DAVID A. NELSON, Circuit Judges, and HIGGINS, District Judge.*
 PER CURIAM.
 
 
 1
 In this consolidated appeal, defendants Anthony Glynn, Reginald Van Harrell, and Kenneth Henderson appeal their convictions on drug and weapons charges. All three defendants were found guilty of distribution of cocaine, in violation of 21 U.S.C. Sec. 841(a)(1), and conspiracy to distribute cocaine, in violation of 21 U.S.C. Sec. 846. Glynn and Harrell also were convicted of unlawful possession and transfer of a short-barrelled shotgun, in violation of 26 U.S.C. Secs. 5812, 5861, and 5871, and being a felon in possession of a firearm, in violation of 18 U.S.C. Sec. 922(g)(1).
 
 
 2
 The defendants raise several different issues on appeal. Both Glynn and Harrell argue that the assistant United States attorney's statements during closing argument were unfairly prejudicial. In addition, Glynn asserts that the district judge's determination that he served as the leader and organizer of the conspiracy was erroneous. Harrell argues additionally that the district court erred by allowing the government to introduce allegedly prejudicial evidence of other uncharged crimes. Defendant Henderson raises three separate errors on appeal: (1) the district court should have granted his motion for a bill of particulars; (2) the evidence offered in support of his conviction was impermissibly different from the allegations contained in the indictment; and (3) there was insufficient evidence to sustain defendant's conviction on the distribution charge.
 
 
 3
 For the reasons set forth below, we affirm the judgment of the district court.
 
 I.
 
 4
 This prosecution grew out of two sales of sawed off shotguns and two sales of cocaine to an undercover agent of the Bureau of Alcohol, Tobacco and Firearms (ATF), Joseph Secrete. Secrete testified that on May 3, 1989, he met defendant Harrell and another person identified as Shorty, who was not involved in this prosecution. Secrete purchased a sawed-off Winchester shotgun for $60.00 from Shorty and gave Harrell $42.00, which Harrell had requested as a fee for introducing the two men. At the time of that transaction, Harrell told Agent Secrete that he had a source for guns and for cocaine and could obtain a kilogram of cocaine for $18,000.
 
 
 5
 On May 16, Harrell told Secrete that he had a friend, Tony Glynn, who had sawed-off shotguns for sale. The following day Secrete picked up Harrell at his house, and the two men drove to Glynn's house on Glastonbury Street where they discussed the sale of a gun. The three of them then drove to a house on Pierson Street, identified as Glynn's mother's home, where Glynn said he kept the shotguns. Glynn went into the house while Secrete and Harrell waited in the backyard. Glynn then brought out two sawed-off shotguns; a Sears .12 gauge pump action, which he said was $150; and a Ranger double-barrelled shotgun, which was $60. Secrete chose the Ranger. Harrell put the gun under his coat and walked with it to Secrete's car. Glynn took the other gun back into the house and the three men met back in Secrete's car. Secrete paid Glynn the $60 and gave Harrell $100 for setting up the sale. While driving back to Glynn's house, Glynn stated that he could get more shotguns as well as cocaine, and if Secrete wanted any, he should go through Harrell.
 
 
 6
 Secrete did contact Harrell again, and Harrell arranged for a drug sale from Glynn. On May 22, 1989, the two men met at Glynn's house, where Secrete bought one-half ounce of cocaine for $480. The actual sale took place in Secrete's car. After Glynn gave Secrete the cocaine and Secrete paid him, Glynn took a portion of the money and gave it to Harrell, saying, "This is for you, Reggie."
 
 
 7
 Sometime later, Secrete and Harrell discussed the purchase of a kilogram of cocaine for $20,000. The two met at the Phoenix Motel and drove to meet Glynn at the Pierson Street house, pursuant to arrangements made by Harrell. Upon arriving at the house, Glynn got into the car and told them that the cocaine had not yet arrived, but that when it did, it would come through the back of the house. He told Secrete that he had people in the area watching for police. Glynn then returned to the house. ATF agents, who were conducting their own surveillance as backup for Secrete, noticed a woman, later identified as Glynn's sister, walking around the street doing her own counter-surveillance and investigating, among other things, the ATF raid van. DEA agents also observed a tan car parked on an adjacent street inside of which were two men who seemed to be lookouts observing the area.
 
 
 8
 About 20 minutes later, DEA agents saw a blue car park near the tan car. Three men got out. One, defendant Henderson, was carrying a plastic see-through grocery bag that contained a cereal box and a carton of milk. Henderson walked over to the two men standing by the tan car and spoke briefly with them. The three men who had gotten out of the blue car then cut through a yard to get to Glynn's home. Secrete subsequently saw them walk through Glynn's yard and also was able to see into the plastic bag which contained the milk and cereal containers. Harrell told Secrete that "[t]hose are the guys with the dope." Harrell then got out of the car and went into the house. Both he and Glynn later came out of the house, with Glynn now carrying the plastic bag containing the cereal box and milk. Glynn handed Secrete the cereal box, stating, "Now where's my $20,000?" Secrete asked to check out the package, and Glynn pulled out a kilogram of cocaine wrapped and in solid brick form. Harrell stated, "The package is straight, I checked it out myself." Secrete got out of the car and went to the trunk, ostensibly to get the money for the cocaine. He put on his sunglasses, a signal to ATF and DEA agents to move in and arrest the participants. While handcuffing defendants Harrell and Glynn, Secrete noticed Henderson and the other two individuals that had arrived with him run out the front of the house and through the back yard. They were subsequently arrested. Search warrants were executed at both the Pierson Street house and Glynn's house on Glastonbury Street, the latter address yielding 14.65 grams of crack cocaine and a scale.
 
 
 9
 The defendants were indicted and convicted following a jury trial.
 
 II.
 A. The Government's Closing Argument
 
 10
 Defendants Glynn and Harrell argue that the assistant United States attorney impermissibly asserted his own credibility and personal belief in the defendants' guilt as a basis for conviction. They point to the beginning of his closing argument:
 
 
 11
 May it please the Court, ladies and gentlemen of the jury, this is what's known as my opportunity for closing argument. This is where I'm able to explain what the evidence shows and how I--how everyone believes that the defendants are guilty as charged.
 
 
 12
 (App. at 211). Defendants note that it is against the Code of Professional Responsibility and the Standards for Criminal Justice for a lawyer "to assert his personal opinion as to the justness of a cause, as to the credibility of a witness ... or as to the guilt or innocence of an accused." Model Code of Professional Responsibility D.R. 7-106(C)(4). Defendants further cite for support United States v. Bess, 593 F.2d 749 (6th Cir.1979). In that case, this court reversed a conviction based in part on the prosecutor's improper statement that the government would never have brought the case if it did not believe that defendant was guilty of committing the charges in the indictment, and in part on the statement in his rebuttal in which he said, "I believe beyond a reasonable doubt that the defendant [was guilty]." Id. at 753. In Bess, however, we noted that we were not adopting a per se reversible error rule on this matter.
 
 
 13
 The threshold determination should be whether counsel's comments can be reasonably construed to be based on personal belief. If so, the statements should ordinarily be deemed to be error. More commonly, however, the complained-of conduct will not rise to reversible error, notably if it is not flagrant, where proof of guilt is over-whelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury.
 
 
 14
 Id. at 756-57 (footnotes omitted).
 
 
 15
 In the present case, it is clear that the prosecutor's statement does not constitute reversible error. First of all, the statement was not objected to by any counsel. While this does not automatically waive a claim of error, it plays a role in this court's determination of whether the statement constituted reversible error. See, e.g., Bess, 593 F.2d at 756-57; United States v. Hart, 640 F.2d 856, 859 (6th Cir.), cert. denied, 451 U.S. 992 (1981). Second, there was only one slip of the tongue, and it was corrected even before the assistant United States attorney had finished his sentence. Finally, there was abundant evidence of defendants' guilt, including tape recordings of defendants planning the cocaine sale and the corroborated testimony of Agent Secrete.
 
 
 16
 "[T]he standard announced [in Bess ] ... as to what constitutes reversible error is flexible, and the reason is to place the basic responsibility on the trial judges to resolve this problem." Hart, 640 F.2d at 859. We do not find the kind of "egregious" violation that existed in Bess to be present here, and we see nothing that would justify reversal of the conviction based on this isolated remark by the assistant United States attorney.
 
 B. Defendant Glynn's Sentence
 
 17
 At sentencing, the district judge enhanced Glynn's Guidelines sentence because he found that Glynn was the leader and organizer of the conspiracy. The Guidelines state:
 
 
 18
 Based on the defendant's role in the offense, increase the offense level as follows:
 
 
 19
 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 
 
 20
 U.S.S.G. Sec. 3B1.1. The commentary accompanying the Guidelines elaborates on how to distinguish a leadership role:
 
 
 21
 Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others....
 
 
 22
 Id. comment (n. 3). In reaching its decision, the district court made the following statement:
 
 
 23
 [T]here's no question in the Court's mind that Mr. Glynn was the organizer and leader, as opposed to a supervisor, which is in another category and so forth, little less category. He had to approve everything.
 
 
 24
 Though other people had to make phone calls, it still came back to him. It was at his mother's home that the transaction took place. His sister was--I call 'em a look out, they call 'em counter-surveillance, the fancy name, but his sister was the look out. There certainly were five people involved.
 
 
 25
 There's three involved right here just in this trial. The sister was involved. The people that were looking at the--checking out the van, the officers' van down the block and so forth, so the five people are easy to come by just at that one scene, sitting in the driveway with the officer when he was wired. So, the Court finds that that happened.
 
 
 26
 The Court believes the testimony is clear that this defendant was the leader of this matter. The thing would not have happened but for his leadership role in this matter, and five people at least were involved by the testimony....
 
 
 27
 (App. at 276-77).
 
 
 28
 Findings of fact with regard to Guidelines determinations are subject to reversal only if clearly erroneous. 18 U.S.C. Sec. 3742(e). United States v. Williams, 894 F.2d 208, 213-14 (6th Cir.1990) (quoting United States v. Wilson, 878 F.2d 921, 923 (6th Cir.1989). Contrary to Glynn's arguments that he was "one of many participants led by one of Defendant's Co-defendants," the evidence clearly indicates that Glynn was at the center of the activity in this conspiracy. The sales were conducted out of his or his mother's house, and Glynn was clearly the person in charge of making the final "arrangements," regardless of the nature of the illicit transaction involved. As the district court noted, it all "came back" to him. We do not find the district court's decision to sentence Glynn as an organizer or leader of a criminal activity to be clearly erroneous.
 
 C. Other Crimes Evidence
 
 29
 Defendant Harrell asserts that it was reversible error for the district court to allow the introduction into evidence of the crack cocaine and scale seized from defendant Glynn's house defendants' arrest. During trial, Harrell objected to this evidence on the grounds that it was unrelated to the charged crime and therefore should be barred under Fed.R.Evid. 404(b):
 
 
 30
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 31
 The government argues that the basis of admissibility was not to show bad character, which is prohibited by Rule 404(b), but to corroborate the fact that the charged one-half ounce cocaine sale occurred at the same place and to help prove the existence, extent, and nature of the conspiracy, as well as the nature of Glynn's participation. We agree, and find no error.
 
 
 32
 This court addressed a similar situation in United States v. Walton, 908 F.2d 1289 (6th Cir.1990), cert. denied, 111 S.Ct. 273 (1990). In Walton, the defendant, on trial for drug conspiracy, objected to drug paraphernalia seized from the basement of her home because she claimed that evidence did not support the proposition that she was engaged in a transaction with the other conspirators at that time. As such, she said, the evidence was highly prejudicial and violated Rule 404(b) as well as Rule 403. Id. at 1298-99. This court rejected that argument, and upheld the district court's decision that Rule 404(b) was inapplicable and the evidence was allowable "to prove continued involvement in the conspiracy, rather than other similar crimes[.]" Id. at 1299.
 
 
 33
 In the instant case, in allowing the evidence, the trial court stated: "They have a pretty strong case on the street, but they're allowed to prove other elements. One of the elements, of course, is distribution, and scales and other drugs certainly would go toward that. The mere fact they have a good case does not prevent them from having a great case." (App. at 116). The cocaine was found while the conspiracy was ongoing. The evidence was not so remote nor so prejudicial as to warrant its exclusion. Moreover, it provided additional evidence to support the government's conspiracy theory. For this reason, defendant's citation to United States v. Ring, 513 F.2d 1001 (6th Cir.1975) (evidence of prior threats is inadmissible to show intent if intent is not an issue), and related cases is inapposite.
 
 
 34
 Even if we were to find the admission of this evidence to be error, we would find it harmless beyond a reasonable doubt. The direct evidence against Harrell detailing his activities was very strong.
 
 
 35
 D. Sufficiency of the Evidence as to Henderson
 
 
 36
 Defendant Kenneth Henderson argues that the evidence offered in support of his conviction for conspiracy to possess and distribute cocaine was both insufficient and impermissibly different from the allegations contained in the indictment as to warrant reversal of the verdict. This argument fails, first, because defendant did not preserve his right to challenge the sufficiency of the evidence, and, second, even if he had preserved this right, we find that a reasonable jury could have found defendant guilty of the charged crime.
 
 
 37
 In order to preserve an opportunity to appeal on sufficiency of the evidence grounds, a defendant must have made a Fed.R.Crim.P. 29 motion for judgment of acquittal at the close of the government's case and again at the close of trial, which defendant failed to do. Absent such a motion, we review only to prevent a manifest miscarriage of justice. United States v. Faymore, 736 F.2d 328, 334 (6th Cir.), cert. denied, 469 U.S. 868 (1984).
 
 
 38
 Notwithstanding this procedural bar, if we were to review the evidence, we would find it sufficient. The standard of review for claims of insufficient evidence in a criminal case is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The evidence is to be viewed in the light most favorable to the government. "A defendant claiming 'insufficiency of the evidence bears a very heavy burden.' " United States v. Vannerson, 786 F.2d 221, 225 (6th Cir.) (citations omitted), cert. denied, 476 U.S. 1123 (1986). Circumstantial evidence alone is sufficient to sustain a conviction, and such evidence need not remove every reasonable hypothesis except that of guilt. United States v. Stone, 748 F.2d 361, 363 (6th Cir.1984). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence ... even if the evidence is circumstantial." United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985). Nor can a defendant challenge the credibility of witnesses at this stage. "[A]ttacks on witness credibility are simply challenges to the quality of the government's evidence and not to the sufficiency of the evidence." Id. at 935.
 
 
 39
 Defendant argues that the evidence was insufficient to show that he possessed the kilogram of cocaine because the cocaine could have been placed into the cereal box after he brought it into the house. However, the jury was allowed to consider that possibility at trial. They chose, instead, to believe the theory that the drugs were in the box before he went into the house, a theory supported by testimony identifying him as one of the "guys with the dope" and additional evidence which showed him talking with the people in the tan car who were conducting surveillance for Glynn. We find no reason to believe that a reasonable jury could not have found that defendant was acting in concert with the other defendants.
 
 
 40
 Likewise, we find no reason to reverse the jury's decision that defendant was part of the conspiracy. Defendant claims there was no direct evidence that he was part of any agreement to violate narcotics laws. We believe, however, that defendant's actions involving delivery of the cocaine could reasonably be construed by the jury as evidence that defendant was working in conjunction with the other members of the conspiracy. The jury heard defendant's arguments at trial, and this court must "give[ ] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.
 
 
 41
 We also reject defendant's argument that the indictment was at variance with the evidence. He suggests that it is more likely that the other two defendants were involved in a separate conspiracy from his own. We find no support for this in the facts, however, as the later purchase of cocaine was clearly connected with arrangements made in the earlier stages of gun and cocaine purchases. Individuals involved with any portion of a conspiracy are part of the entire conspiracy. See Walton, 908 F.2d at 1299 ("Conspirators are generally liable for the known or foreseeable acts of their co-conspirators[.]") Moreover, this allegation was not raised at trial,[1] and so it is not preserved for appeal.
 
 
 42
 E. Henderson's Motion for a Bill of Particulars
 
 
 43
 Defendant Henderson also contends that the district judge's decision not to grant his motion for a bill of particulars was reversible error. Specifically, defendant suggests that the charge of conspiracy against him was too vague to enable him to prepare an adequate defense.
 
 
 44
 The purposes of a bill of particulars are to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes.
 
 
 45
 United States v. Birmley, 529 F.2d 103, 108 (6th Cir.1976). An application for a bill of particulars is addressed to the sound discretion of the district court. United States v. Kendall, 665 F.2d 126, 134 (7th Cir.1981), cert. denied, 455 U.S. 1021 (1982). The test in passing on a motion for a bill of particulars should be whether it is necessary that defendant have the particulars sought in order to prepare his defense and in order that prejudicial surprise will be avoided. 1 C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE Sec. 129 (1982).
 
 
 46
 In the present case, the indictment filed by the government consisted of seven counts. Count one charged Kenneth Henderson, along with two other named individuals, with distributing cocaine and aiding and abetting each other in its distribution, in violation of 21 U.S.C. Secs. 841(a)(1) and 18 U.S.C. Sec. 2. Count two charged all three defendants with conspiracy to distribute cocaine, in violation of 21 U.S.C. Sec. 846. Each of the counts specifically identified all of the charged individuals. Moreover, the record demonstrates that Henderson received complete discovery from the government concerning his role in the crime. Henderson does not contest this fact. Upon a fair reading of the indictment, we find that it offers defendant sufficiently specific language by which he could prepare an adequate defense and does not create the type of unfair surprise a bill of particulars is intended to avoid.
 
 
 47
 Defendant further argues that there was no evidence that he was aware of or involved in the illegal activities of the other two defendants prior to his arrest, and thus there is little or no difference between the substantive offense charged in count two and the conspiracy offense charged in count one. We first note that often the same or similar evidence will be used to prove both a substantive and a conspiracy count. The test is not the similarity of the evidence but whether the totality of the evidence is sufficient to prove the elements of both counts. Here, we believe that there was ample direct and circumstantial evidence supporting a conviction on both the substantive and conspiracy counts. Also, to the degree this argument turns on the sufficiency of the evidence, we have already indicated that that issue is not properly before us.
 
 
 48
 AFFIRMED.
 
 
 
 *
 Honorable Thomas A. Higgins, United States District Court, Middle District of Tennessee, sitting by designation
 
 
 [1]
 Defendant did not ask for a jury instruction on the question of multiple conspiracies. Where a party fails to request a jury instruction, "reversal is required only in those exceptional circumstances where necessary to avoid a miscarriage of justice." United States v. Hatchett, 918 F.2d 631, 643 (6th Cir.1990), petition for cert. filed Apr. 8, 1991, No. 90-1544