**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Scott E. SMITH, Defendant–Appellant.**

**No. 85–3842.**

United States Court of Appeals, Sixth Circuit.

Argued April 22, 1986.

Decided Oct. 21, 1987.

G. Gary Tyack (argued), Tyack and Grubb, Columbus, Ohio, for defendant-appellant.

John R. Fisher (argued), Columbus, Ohio, for plaintiff-appellee.

Before LIVELY, Chief Judge, and WELLFORD and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

■ This is an appeal of a conviction for armed robbery of a bank. Although there was abundant evidence of the defendant's guilt, the case presents a somewhat troubling problem for us because, after restricting cross-examination of an important government witness, the district court apparently declined to permit the defendant's counsel to make a contemporaneous proffer of the witness' expected testimony, on the record and in the court's presence, directing instead that the proffer be made at a later time. Although the practice of permitting proffers to be added to the record only during a recess and outside the presence of the court is not without precedent in the state courts of Ohio, it is not a good practice, in our view, and ought not be followed by the federal trial courts of this circuit.

In this case the trial judge did permit counsel to approach the bench after an objection to defense counsel's cross-examination had been sustained; while the colloquy at the bench was not recorded, defense counsel did have an opportunity to tell the judge the purpose of the questioning. Instead of repeating his proffer on the record at the next recess in the trial, as he could and should have done, defendant's counsel waited until the time of sentencing, some two months after the trial itself had been concluded, before entering the proffer in the record. By that time the memories of the opposing attorneys had dimmed to the point where the lawyers could no longer agree on what the substance of the proffer had been. If the prosecutor's version is correct, there was no error in sustaining the objection. The question ought to have been permitted if defense counsel's version is correct, but we are satisfied that any error in the evidentiary ruling, like the error committed by the trial court in directing that the proffer be made outside the court's presence, was harmless. Accordingly, the conviction will be affirmed.

\* \* \*

At approximately 11:00 a.m. on March 13, 1984, two armed robbers entered a branch of the BancOhio National Bank in Cumberland, Ohio. One of the robbers carried a sawed-off shotgun and wore a bushy dark beard, tortoiseshell glasses, and a blue woolen toboggan cap. The government claims this man was C.E. (Clarence) Smith, an uncle of defendant Scott Smith. The other robber—allegedly Scott Smith—wore a ski mask that left only his mouth and eyes exposed. He carried a revolver. The bearded man handed a paper sack to one of the bank's two tellers and demanded that she fill it with cash. She did so, and the men left with about $47,000 in currency.

There were no eyewitnesses to the robbery aside from the two tellers. The robbery was recorded on film by overhead surveillance cameras, however, and twenty-

six photographs taken during the robbery were admitted at trial.

Eight months after the robbery Clarence Smith and one Lewis Kirkbride, an individual who had been a roommate and co-worker of defendant Scott Smith, were arrested in Indiana. The arresting officer searched Clarence Smith's car and discovered a wig, theatrical makeup, nose putty, several pairs of glasses, and material for a false beard or mustache. This was not the first time such paraphernalia had been in the possession of Clarence Smith. Joan Robinson, his sometime girlfriend, testified at trial that Clarence had left a briefcase with her in late 1983. She opened the briefcase and found a revolver and sawed-off shotgun resembling those depicted in the surveillance photographs, a wig, makeup, and a bottle of clear liquid. (With the liquid, as Clarence demonstrated when he put on his disguise for her at one point, he could simulate scars.) Ms. Robinson identified the bearded robber in the photographs as Clarence Smith.

The government showed that in March of 1984 Defendant Scott Smith was being held in the city jail of Zanesville, Ohio, for a traffic offense, and was permitted to leave the jail on a daily basis under a work-release program. On the date of the robbery Scott Smith was logged out of the jail at 5:30 in the morning and was not logged back in until 9:30 in the evening. Records for the work-release program showed that Scott Smith was employed at a Zanesville body shop managed by his uncle, Clarence E. Smith. Zanesville is about 20 miles from Cumberland, where the robbery occurred.

The government also established that on the afternoon of the robbery Scott Smith bought a 1979 Ford pickup truck for which he paid $3000 in cash. The person who took his money testified that Scott Smith "was very nervous when he handed me the money;" his hands were shaking, and he was pacing the floor. Scott overpaid initially, and some of the money was returned to him. His demeanor was so extraordinary that the salespeople teased him about his nervousness. A detective investigating the bank robbery interviewed Scott Smith a few days after the robbery, and was told by Scott that Clarence Smith had lent him most of the money to buy the pickup truck.

Lewis Kirkbride, who also worked at the body shop, testified that he was with Scott when Scott purchased the Ford pickup truck (a purchase made on the afternoon of the day the bank was robbed, as noted above,) but Kirkbride said he had not worked alongside Scott and Clarence that morning; Scott and Clarence had left together in a van, according to Kirkbride, and had not returned until some two and a half or three hours later.

Kirkbride testified that while going to the dealership where Scott bought the truck, Scott offered Kirkbride $1000 in cash for the latter's 1966 Impala. Scott was carrying a black trash bag full of money that "had red wrappers around it." About a week later Scott purchased a 1970 Javelin for $800 in cash. Near the end of March Scott gave Kirkbride $350 to buy a television set for him. Kirkbride had not known Scott to have a significant amount of disposable income before these purchases started in March.

In February of 1985 Kirkbride was shown the bank surveillance photographs taken during the robbery; he identified the robbers shown in the pictures as Clarence and Scott Smith. Kirkbride claimed to be able to identify Clarence Smith because, like Ms. Robinson, he had previously seen him in the same disguise. He claimed to be able to identify Scott Smith because the mask was "cut back pretty far" around the eyes and mouth and because the robber's build resembled Scott's. Kirkbride, who had lived and worked with Scott Smith, asserted there was no doubt in his mind that the masked man in the picture was Scott.

On direct examination the prosecutor brought out that Kirkbride had testified against Clarence as part of a plea bargain entered into in certain proceedings in Anderson, Indiana. Kirkbride was to return to the Indiana court to plead guilty, and he expected to receive a suspended sentence. Kirkbride had also been charged

in Fort Wayne, Indiana, for aiding and abetting an armed robbery with Clarence Smith. As part of a plea agreement that required him to testify against Clarence in that case, Kirkbride had pleaded guilty and had received six years' probation. Kirkbride denied that he was under any commitment to testify against Scott Smith, because Scott was not involved in the Indiana charges. On cross-examination, Kirkbride admitted that he had made the photo identification of Scott at a time when he was trying to resolve his legal difficulties in Indiana. Kirkbride further agreed, on cross examination, that his testimony against Scott was "all part of that same [Indiana] arrangement...." On redirect the prosecutor brought out that Kirkbride's identification was made before he was even aware of any federal case against the Smiths in Ohio.

Kirkbride's testimony corroborated that given by Kimberly Doty, a young woman who had dated Scott Smith from December of 1983 until early March of 1984 and had visited the body shop over 20 times during that period. On one such visit Clarence Smith told her she was wearing her makeup too dark, and volunteered to show her how to put makeup on correctly. Clarence then brought out his disguise kit, displaying makeup and a wig, fake sideburns, and "tobaggons." Ms. Doty said she also saw a sawed-off shotgun and a handgun at the body shop, and that Scott Smith was with her when Clarence showed her the makeup and the guns. She testified that the sawed-off shotgun she saw in the body shop appeared indistinguishable from that depicted in the surveillance photographs.

Ms. Doty also testified about an occasion when, after Scott had bought his pickup, Scott gave Clarence a black trash bag wrapped in tape. The bag contained money in wrappers.

In May of 1984 Ms. Doty went to the sheriff's office in Zanesville, Ohio, where she identified Scott and Clarence as the robbers in the bank surveillance photos. Shown the surveillance photos in court, Ms. Doty again identified its subjects as the two Smiths and gave a number of reasons why she had "no doubt at all" as to the accuracy of that identification. (It was the cross-examination of Ms. Doty that was curtailed by the trial court, and we shall return to that shortly.)

The defense offered no testimony aside from that of Scott Smith's parents. Scott's father testified that he had lent his son $550 in early March to buy a truck. Regarding the Javelin, Mr. Smith testified that the purchase price was $200 and it was titled in his name. Scott's mother examined the bank surveillance photos and stated that her son was not pictured in them.

The testimony was concluded after two days of trial. The jury was charged the following morning, and a guilty verdict was returned that afternoon.

\* \* \*

Defense counsel's cross-examination of Kimberly Doty began with what could reasonably be construed as a general attack on her character:

"Q. Your first contact with Scott was in Christmas of 1983?

A. Yes.

\* \* \* \* \* \*

Q. ... you were 18 and you were in a bar?

A. Yes.

Q. Did you have a child with you at that point in time?

A. I didn't have him with me, but I do have a child.

Q. How old was the child at that time?

A. He wasn't even a year old yet.

Q. You have indicated that you saw C.E. Smith later on in the spring. Where were the two of you going on that day?

A. To eat supper, he had asked me out to eat.

Q. Was he taking you to a truck stop?

A. No, we went to the Holiday Inn.

Q. It is safe to say that the clothes you have worn into the courtroom are a lot different than the kinds of things you were wearing back in Christmas of '83 and winter of '84, isn't it?

A. No.

[PROSECUTOR]: Objection, your Honor.

THE COURT: Sustained.

[PROSECUTOR]: May counsel approach the bench?

THE COURT: Yes.

(Discussion off-the record.)

THE COURT: I instruct the jury to disregard the answer."

Two months after the trial the prosecutor and defense counsel went back to court and gave the court reporter the following statements, for insertion at this point in the record, setting forth their conflicting recollections as to the content of the off-the-record discussion at the bench:

[DEFENSE COUNSEL]: The Court directed during trial that a proffer be made at a later time of the testimony of Kim Doty which I was attempting to elicit. The testimony was that Kim Doty had earlier admitted to Muskingum County and Zanesville authorities that she was engaging in prostitution during the time that she was seeing Scott and having contact with C.E. Smith, a co-defendant in this matter. She claimed that her reason for doing so was a threat from C.E. Smith or Scott both, [sic] that if she did not engage in prostitution, they would attempt to have her young child taken from her and placed in the custody of Children's Services or a third party. Based on this, I felt that I should get this information so her feelings about Scott and her credibility would be further in question, also her bias as to Scott and C.E. would be further clear on the record in the jury evaluating her testimony. That was what was intended by the line of questions that were contemplated and discussed only briefly at the bench. On the record they were discussed at some length at the bench, but that conference, if I recall, was not on the record.

[PROSECUTOR]: As I recall the proffer made at the bench, the effort was to cross-examine Kim Doty about prior instances of prostitution which she had admitted. She was never arrested or charged for those events, she has never been convicted of those events, and under the Federal Rules of Evidence, I believe that such information is not properly admissible to impeach her testimony of her character. My recollection is that the special purpose of showing bias against Scott Smith was not presented to the Court as a justification for the line of questioning, and therefore the Court was never asked to rule on that basis. My recollection is that the effort was to impeach her with prior instances of past misconduct.

[DEFENSE COUNSEL] My recollection differs from Mr. Fisher in that regard, because I believe I presented that which I presented today."

■ If the prosecutor is correct in his recollection of what was proffered during the off-the-record conference at the bench, the court did not err in sustaining the objection. Whether witness Doty dressed as a prostitute or engaged in prostitution during the period when she was associating with the Smiths would have little relevance to her credibility as a witness. *United States v. Mansaw,* 714 F.2d 785, 789 (8th Cir.), *cert. denied,* 464 U.S. 964, 104 S.Ct. 403, 78 L.Ed.2d 343 (1983). See Rule 608, Fed.R.Evid.

If defense counsel's recollection of the proffer is correct, however, the trial court ought to have permitted counsel to try to show that Ms. Doty was biased against the Smiths because of their alleged threat to have her baby taken away from her if she did not engage in immoral conduct. Although trial judges retain wide latitude to limit "cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," *Delaware v. VanArsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674, 683 (1986), a defendant is not to be "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury

the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Id.* at 680, 106 S.Ct. at 1436 (quoting *David v. Alaska,* 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)).

It was not the fault of the trial judge, in the case at bar, that defense counsel waited until long after the trial had been concluded before dictating his recollection of the proffer into the record. If the proffer had been dictated at the next recess in the trial, in accordance with the normal practice in Ohio's state courts, and if a dispute had arisen then between the prosecutor and the defense counsel as to what had actually been said during the off-the-record discussion at the bench, the matter could easily have been referred to the trial judge for resolution at a time when his memory would still have been fresh. But for defense counsel's own lapse, there probably would have been no problem. The better practice, nonetheless, would have been for the trial judge to permit the proffer to be recorded, outside the hearing of the jury but in the presence of the judge himself, before the testimony of the witness had been concluded. By listening to a proffer as it is actually being dictated into the record, a trial judge gives himself the same opportunity a reviewing court may ultimately have to understand precisely what counsel wished to show, and by doing so when the witness is still available to testify, the trial judge retains the power to receive the testimony if, on reflection, he finds the proffer persuasive.

If we assume that the proffer made in this case during the unreported colloquy at the bench corresponds to defense counsel's subsequent recollection of it, we would have no possible basis for ordering a new trial if the jury did, in fact, possess "sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government." *United States v. Christian,* 786 F.2d 203, 213 (6th Cir.1986) (quoting *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496). It seems to us that the testimony actually heard by the jury in this case did provide sufficient information to enable the jury to make a proper appraisal of witness Doty's possible motives for testifying falsely against the Smiths:

"Q. You were seeing C.E. Smith regularly after Scott broke up with you, were you not?

A. Yes, I was.

Q. There is really no debate that Scott broke up with you, not you breaking up with Scott, right?

A. Yes, because he wanted to date my sister.

Q. You speculate as to what his reasoning was.

THE COURT: Now, just a minute, Mr. Tyack. She has made that as a definite statement. That was her reason, she says, for breaking up, she says was because he wanted to date her sister. That is not speculation, that's a simple statement of fact.

MR. TYACK [DEFENSE COUNSEL]: But with all due respect, your Honor, she said that was my client's reason for breaking up with her, and she is real clear that my client broke up with her. I think her statement about his state of mind is a little more specula—

THE COURT: Do you consider that you broke up with Scott Smith?

THE WITNESS: No, he broke up with me.

THE COURT: Did he?

THE WITNESS: Yes.

THE COURT: Because he wanted to date—

THE WITNESS: Yes, he was chasing my 15–year old sister.

THE COURT: Because he was dating your 15–year–old sister, did you refuse to go out with him?

THE WITNESS: Yes.

[DEFENSE COUNSEL]: Would the Court reconsider its bench ruling?

THE COURT: No.

Q. Now you are saying that it is your belief he broke up to date your sister?

A. That's right.

Q. Do you recall being out in a car with Scott and a relative of his shortly before the last time you two went out?

A. No, I don't.

Q. Do you remember doing any activity in the back seat of a vehicle—

[PROSECUTOR]: Objection your honor.

THE COURT: Overruled.

Q. Do you recall doing any activity in the back seat of a vehicle?

A. Yes, I was, *because I was told if I did not do anything that I was told to do by C.E. Smith, that he was going to take my child and I would never see my son again, and that's the only reason I did what I did, is because he threatened me with my son, and I will do anything in the world for my son.*

Q. So you got a lot of anger and a lot of upset at Scott and C.E.?

A. No, I don't, no, because I can forgive and forget. You can forgive and forget, just like the Bible says, 'Turn the other cheek.' Justice is what they need, that's all. I didn't do anything any normal, other human being wouldn't do." (Emphasis supplied).

■ That testimony, it appears to us, contained a sufficient showing of bias to render harmless any error that may have been committed by the trial court in refusing to allow defense counsel to interrogate Ms. Doty about her style of dress. The ultimate point of the disallowed question, it is now claimed, was to show that the Smiths were threatening to have Ms. Doty's baby taken from her. The threat was soon made known to the jury anyway, and whatever prejudice might have resulted from the disallowance of the question was thereby dissipated. The defendant was only entitled to a "fair trial, not a perfect one," moreover, and where a "reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Rose v. Clark*, 478 U.S. ——, ——, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460, 471 (1986). We have carefully reviewed the entire record developed at the trial in this case, and we are satisfied that the defendant's guilt would have been established beyond a reasonable doubt even without the testimony of Ms. Doty. *Cf. United States v. Christian*, 786 F.2d 203 (6th Cir.1986).

■ The remaining assignments of error need not detain us long. The defendant objects to the trial judge's questioning of the witness Doty about the breakup of her relationship with defendant Scott Smith, but we see no reversible error in that questioning. "In a trial by jury in a federal court, the judge is not a mere moderator," *Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933), and a trial court may properly question witnesses to clarify their testimony. See Rule 614(b), Fed.R.Evid. The Advisory Committee's Note to Rule 614 states that the judge abuses his authority if his examination becomes "that of [an] advocate." Rule 614(b), Fed.R.Evid., Note of Advisory Committee. No such abuse appears here. The trial court's questioning may well have helped the defendant, indeed, by emphasizing Ms. Doty's potential bias against him. The defense also complains that on one occasion the court asked a question of Ms. Doty that led to disclosure of the damaging fact that in the spring of 1984 Scott Smith had been a suspect in the theft of auto tires. Defense counsel cannot be heard to complain on this point, however, because the court simply asked a neutral clarifying question after defense counsel opened a line of questioning that elicited vague responses from Ms. Doty. Moreover, the defense did not move to strike the answer or request a limiting instruction.

Before the trial began, the judge told the jury that no action on his part during trial "is intended to indicate my opinion as to how you should decide the case, or to influence you in any way...." The court further instructed that it might on occasion ask a question of a witness, "and if the court does so, it is for the purpose of bringing out matters which I feel should be brought out, and not in anyway to indicate my opinion of the facts, or to indicate the weight I feel you should give to the testi-

mony of that particular witness." In its instructions at the end of trial, similarly, after observing that it had asked questions of some witnesses, the court reiterated:

"The court has the right, and indeed the duty, to see that facts are clearly presented, and my purpose in asking questions was to clarify certain matters in the case.

Again—and I emphasize this as strongly as I know how—you are not to draw any conclusion that by my interrogation of any witness I have intended to convey any point of view as to the witnesses' credibility."

Any conceivable prejudice from the court's questioning of Ms. Doty was cured by these strong instructions, in our view.

It is urged that the evidence of guilt was insufficient to support the jury's verdict, but that contention has no merit, as we read this record. Equally without merit is the defendant's contention that the court erred in refusing to give an instruction on eyewitness identification patterned after the model set forth in *United States v. Telfaire*, 469 F.2d 552, 558–559 (D.C.Cir. 1972). That instruction tells the jury to consider the opportunity that an eyewitness had to observe the offender at the scene. Ms. Doty and Mr. Kirkbride were not eyewitnesses to the crime; they merely identified defendant Smith as one of the men in the surveillance photographs. The district court properly rejected portions of the proposed instruction that would have been irrelevant and confusing, and the court correctly instructed the jury to consider those factors, such as the clarity of the photos, that would affect the value of the testimony identifying the men in the pictures. "[I]dentification instructions are within the discretion of the trial court," *United States v. Boyd*, 620 F.2d 129, 131 (6th Cir.), *cert. denied*, 449 U.S. 855, 101 S.Ct. 151, 66 L.Ed.2d 69 (1980), and there was no abuse of that discretion here.

AFFIRMED.

WELLFORD, Circuit Judge, concurring:

I concur in the affirmance of the conviction. I write separately to emphasize that the practice of permitting proffers of evidence to be made only during a recess and outside the presence of the court is not only not good practice, but it is also not fair to the party who is forced to make such a proffer in response to a ruling by the trial court.

For the trial court not to make a full record, furthermore, of discussions at the bench concerning a ruling or some other evidentiary matter contemporaneously fails to conform to the law, requiring a full transcription of trial proceedings. I would specifically find this practice to be unacceptable.