NOT RECOMMENDED FOR PUBLICATION
File Name: 06a0332n.06
Filed: May 10, 2006

No. 04-2371

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

      v.

JARROD JOHNSON,

    Defendant-Appellant.

On Appeal from the United States District Court for the Eastern District of Michigan

_____/

**Before:**     **GUY, DAUGHTREY, and CLAY, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**    Defendant Jarrod Johnson appeals from his convictions and sentences for armed bank robbery, using a firearm during the robbery, and being a felon in possession of a firearm. He contends that (1) the prosecutor unlawfully excluded potential black jurors from the jury in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), (2) the district court improperly allowed the introduction of evidence of a past criminal act, (3) the district court denied him a fair trial, and (4) his sentence should be vacated in light of *United States v. Booker*, 543 U.S. 220 (2005). After carefully reviewing the record, we find no error in defendant's convictions. We vacate his sentence, however, and remand for resentencing.

## I.

On December 10, 2002, Johnson, Dorian Sykes, and Brian Gibson robbed the Fifth Third Bank branch in Warren, Michigan. The day before the robbery between 4:30 and 5:00 p.m., two black men entered the bank, and the taller one inquired about opening an account. From a surveillance photograph depicting one of the individuals who had been in the bank just before closing on the day before the robbery, Tameika Lee, Johnson's girlfriend, identified Johnson. On the day of the robbery, Johnson and Sykes entered the bank masked. Johnson brandished a gun, ordered bank employees to the ground, and threatened to kill them if they did not give the robbers all the money. Bank employees described the gun as having an 8- to 12-inch black gun barrel with vent holes and a bottom ammunition clip section. After Johnson and Sykes collected $196,000 in cash from the bank's drawers and vault, they ran to an adjacent restaurant where Gibson was waiting in a green Chevy Trailblazer.

The Trailblazer's license plate number was traced to Gibson, who had acquired the plate when he purchased a car from his sister, LaShawn Gibson. Ms. Gibson identified Sykes from the bank's surveillance photos, and she identified the other man in the photos as one of Sykes's friends. Ms. Gibson searched her basement and found a bag containing $8,770 that was traced to the robbed bank.

Tameika Lee owned a 2002 green Chevy Trailblazer. She loaned it to Johnson the day of the robbery because he said he needed it to drive to a job interview. He returned in the afternoon wearing a new Rolex watch with diamonds and a new pair of Cartier sunglasses. Johnson had purchased two Rolex watches with diamonds and two pairs of Cartier sunglasses from a pawn shop earlier that day for $15,400 in cash. Johnson gave Lee $100 in cash, and when she asked him if the money was intended to keep her quiet, he said yes. FBI agents

arrested Sykes on December 13, 2002, and after speaking with Sykes, agents arrested Johnson. The agents searched Johnson's home in Detroit, where they found a loaded Tech 9 machine-gun pistol, several types of ammunition (38-caliber ammunition, 22-caliber ammunition, a clip for a 22-caliber rifle), a box for a 380 handgun, shoes worn during the robbery, and documents linking Johnson to the residence.

Gibson pleaded guilty to the robbery and testified at Johnson's trial to the following events. Sykes, Gibson's nephew, introduced Gibson to Johnson two days before the robbery. The following day, Gibson and Sykes picked up Johnson from Johnson's father's home in Detroit. Sykes told Gibson that he and Johnson had cased the Fifth Third Bank and they intended to case it again that day with the intent to rob it the following day. They asked Gibson to assist them by serving as the get-away driver. Gibson agreed on the condition that they rob the bank with a note and not use any firearms. Johnson and Sykes assured him that they had just robbed a bank unarmed two days earlier, on December 7, 2002. Under their plan, Johnson would be the lookout at the door, and Sykes would hand the note to the teller. Gibson drove with Sykes and Johnson to the bank, but he stayed in the car while they cased the building. Johnson said that they would use his girlfriend's green Chevy Trailblazer, and Gibson agreed to provide a non-traceable license plate.

The next morning, Johnson and Sykes picked up Gibson in the Trailblazer. They went to Johnson's father's house on Dorothy Street in Detroit where Johnson changed clothes and returned to the car carrying a Tech 9 assault weapon wrapped in a blanket. The gun was black with vent holes in the barrel. When Gibson questioned the presence of the gun, Sykes told him it was too late to change their plans.

Gibson parked the Trailblazer in a back corner of the parking lot of an Olive Garden restaurant located next to the bank. Gibson changed the license plate, and everyone donned their masks and gloves. As Sykes and Johnson entered the bank, Gibson saw Johnson carrying the gun and a duffel bag. When they exited the bank running, Johnson had the gun and the duffel bag, and Sykes had the money in his pockets and hands. After driving a few blocks away, Gibson pulled over and changed the license plate, throwing away the one he thought was untraceable. Both Johnson and Sykes told Gibson what had occurred in the bank as they drove into the garage at Johnson's home in Detroit. Inside the house, they counted the money and split it up. Gibson was paid $40,000, and Sykes and Johnson split the rest. Gibson left the state and shortly after was arrested by the FBI, to whom he admitted his participation in the bank robbery.

After his extradition to Detroit, Gibson was placed in the same holding cell as Johnson. Johnson told Gibson he had used the money to buy an expensive watch for his father, a Celtics outfit for himself, and that he had funneled some of the money to his aunt to pay his anticipated upcoming legal expenses. Johnson also told him that he knew Sykes had spoken with the FBI, but that Johnson and Gibson should stick to their alibi given Sykes's history of mental health problems. In September 2003, Gibson again saw Johnson, this time at Milan prison, where Johnson warned Gibson that he and his family should be "real careful" should Gibson decide to testify. Gibson and Johnson crossed paths next in a Wayne County holding cell in April 2004. Johnson told him he was aware that Gibson had been talking to the FBI and threatened that he (Johnson) carried a gun and Gibson should know what would happen

if he testified. The morning of his testimony, Gibson saw Sykes and Johnson in the holding cells, and they named about 12 family members who could be hurt if Gibson testified.

Sykes, having already pleaded guilty, testified for the defense. He claimed that only he and Brian Gibson were involved in the bank robbery. Sykes admitted that at his guilty plea hearing, he had testified that Johnson had committed the robbery with him, but he claimed he had been coerced into saying that. In rebuttal, FBI Agent Fleming explained that Johnson, in an interview with the FBI, admitted his involvement in the robbery, including his participation in planning the robbery, casing the bank, and purchasing the masks and gloves. Johnson also admitted that he held the Tech 9 firearm during the robbery, and he and the others divided the spoils at his home. He also admitted that he had purchased the Rolex watches, the Cartier sun glasses, and a Chevy Impala with the robbery proceeds. Agent Fleming also had similar meetings with Sykes, who had given him a version of events similar to that given by Johnson.

The district court took judicial notice that the firearm traveled in interstate commerce, and Johnson stipulated to the federally insured status of the bank and to his prior felony conviction.

The jury convicted Johnson of bank robbery, in violation of 18 U.S.C. §§ 2113(a) & 2 (count one); using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1) & (2) (count two); and felon in possession of a firearm, in violation of 18 U.S.C. § 924(g)(1) (count three). The district court sentenced Johnson under the sentencing guidelines to concurrent sentences of 115 months' imprisonment on counts one and three and an 84-month consecutive sentence as to count two,

in addition to $166,230 in restitution to Fifth Third Bank. At the sentencing hearing, the district court noted that the Supreme Court might soon rule that the guidelines should no longer be used or at least they would not be mandatory, and the court stated that if the guidelines were not in place, it would have sentenced Johnson to a total of 180 months.

## II.

### A.     The Government's Use of Peremptory Challenges

The district court allowed defendant eleven peremptory challenges and the government seven. In response to a question about whether he might have any bias against a witness who cooperated with the government, juror number two, a black man, admitted, "Well, it doesn't sway any way in my decision making but, you know, naturally, yeah." When the district court denied the prosecutor's challenge for cause, the prosecutor exercised a peremptory challenge against the juror. The prosecutor exercised two more peremptory challenges without incident. When the prosecutor exercised her fourth peremptory challenge against juror number four, a black woman, defendant requested a sidebar and stated, "the prosecutor has used four peremptories, two of them have been African-American. I didn't object to the first one, there was some really [sic] question there, but I do object to this one." The court noted the objection and advised defense counsel, "If you have anything else to say about it, say it at the end of the whole process." The prosecutor used one more challenge without incident. Defendant did not bring the issue up again before the district court.

The Equal Protection clause of the Fourteenth Amendment prohibits the prosecution from excluding potential jury members on account of their race. *Batson*, 476 U.S. 79. Johnson, who is black, argues that the government denied him his equal protection rights by

striking two potential black jurors from the prospective jury panel. We review a challenge

to a district court's determination of a *Batson* challenge for clear error. *United States v.*

*Copeland*, 321 F.3d 582, 599 (6th Cir. 2003). To establish a *Batson* violation,

> the complaining party must first made a *prima facie* showing that the
> peremptory challenge was based on race. If the complaining party establishes
> a *prima facie* case, the burden of persuasion then shifts to the party making the
> strike to articulate a race-neutral explanation for removing the juror in question.
> This explanation 'need not be particularly persuasive, or even plausible, so long
> as it is neutral." Once a race-neutral explanation is produced, the complaining
> party must prove purposeful discrimination. Purposeful discrimination may be
> shown by demonstrating that the proffered explanation is merely a pretext for
> racial motivation. Throughout the *Batson* inquiry, the ultimate burden of
> persuasion always rests with the party challenging the strike.

*United States v. Jackson*, 347 F.3d 598, 604 (6th Cir. 2003) (internal citations omitted).

Johnson cannot establish a *prima facie* case. The prosecutor's strike of two potential black

jurors is not enough to raise an inference of discrimination without something more, such as

information concerning the ultimate composition of the jury or the number or percentage of

black jurors. In *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1519-22 (6th Cir. 1988),

we held that in circumstances more extreme than those in this case, where the prosecution

used all or nearly all of its peremptory challenges to exclude members of an identifiable

minority racial group, the defendant must still raise an inference of discrimination through

other relevant factors to satisfy his *prima facie* burden. We explained:

> We reject [the defendant]'s underlying premise that an inference of
> intentional discrimination will *always* arise if, without more, there is a showing
> that the prosecution used all its peremptory challenges to exclude blacks. We
> reject such a per se rule, particularly because it does not take into account
> considerations that may be very relevant, including the percentage of the racial
> group in the district jury pool or original jury; the pattern of strikes exercised
> by the defense; the number of strikes available to the government; and the
> composition of the ultimate jury sworn.

The Supreme Court's mandate in *Batson* to consider all the facts and circumstances means that we cannot lay down clear rules as to the specific numbers or percentages that will constitute or refute a prima facie case. However, we can state a number of factors which tend to support or refute the inference of discrimination necessary to make a prima facie case. Our discussion of these factors assumes a case such as we have here, where the government's peremptory challenges have all (or mostly) been against members of a cognizable racial group to which the defendant belongs.

If, after the jury selection process has ended, the final jury sworn has a percentage of minority members that is significantly less than the percentage in the group originally drawn for the jury (or in the whole jury pool or in the district), then that would be a factor pointing toward an inference of discrimination. If, on the other hand, the percentage of minority members in the ultimate jury is the same or greater, that would be a factor tending to negate the inference of discrimination.

If there are minority members on the jury but the prosecutor did not use all its peremptory challenges, that would be a factor tending to refute discrimination. However, if all the prosecutor's challenges were used, that fact would point toward an inference of discrimination.

Moreover, if the defense did not display a pattern of strikes against non-minority members, that fact might support an inference of discrimination. Yet, if the defense has clearly engaged in a pattern of striking non-minority members, that might make an inference of discrimination arising from the prosecution's opposing strikes less tenable. As an extreme example, if the defense strikes all six whites from an original jury panel of six blacks and six whites, there is a lesser inference of discrimination from the fact that the prosecution's subsequent strikes fall solely on the six remaining blacks.

Other than the fact that two out of five peremptory challenges were used to exclude black jurors, Johnson presents absolutely no other factors for us to consider that might raise an inference of discrimination. That failure, combined with his failure to pursue the issue at the close of jury selection as the district court suggested, and his attorney's admission that the prosecutor had good reason aside from race to strike one of the black potential jurors, requires us to reject his *Batson* challenge.

**B.      Evidence of a Previous Bank Robbery**

Gibson testified that Sykes and Johnson talked to him on December 9, 2002, about a robbery they had completed on December 7, and defendant objected on the ground that the testimony was not relevant. The district court overruled the objection when the prosecutor responded that it was "a part of the coconspirator statements." Gibson then reported that Sykes and Johnson told him that the $9,600 that they claimed to have won from a casino on December 8 was actually from a bank robbery they committed on December 7. Defendant renewed his objection, arguing that the evidence was not within the bank robbery conspiracy charged in this case. The government responded that the statements were made in the context of recruiting Gibson to participate in another bank robbery. The Court advised her to end that line of questioning. When Gibson stated that he told Johnson he would participate in the robbery if no gun was used, and the prosecutor asked him if Johnson told him that the December 7 robbery was completed with just a note, defendant objected because the court had prohibited further inquiry into that area. The court sustained the objection.

At the end of the day, Johnson moved for a mistrial, arguing that he was prejudiced by the mention of the other bank robbery. The court denied the motion, and the prosecutor suggested instructing the jury about the limited purpose of the evidence of another robbery. The court agreed to give such an instruction but left the decision to defense counsel's discretion, stating that the court would be available, if needed, the following morning. Johnson never requested or submitted a proposed instruction.

Johnson contends that Gibson's statements were evidence of a past criminal act, which required the government to give Johnson pretrial notice of such evidence and also required

the district court to evaluate several factors before admitting the potentially prejudicial statement.[1]  *See* Fed. R. Evid. 404(b); *United States v. Merriweather*, 78 F.3d 1070 (6th Cir. 1996).  We review evidentiary issues for abuse of discretion.  *United States v. Mack*, 258 F.3d 548, 553 (6th Cir. 2001).

The government argues that the statements were not introduced as 404(b) evidence, but rather as background evidence relating to Johnson's recruitment of Gibson into the robbery scheme by assuring him that he had successfully robbed a bank a few days before with no firearm.  "Proper background evidence has a causal, temporal or spatial connection with the charged offense.  Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense."  *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000).

Gibson's statement about Johnson's previous bank robbery was not introduced as "other acts" evidence under Rule 404(b), but was offered as background evidence relative to Johnson's recruitment of Gibson into the conspiracy to rob the bank.  This court has held that similar evidence may be introduced as background evidence.  In *United States v. Wesley*, 417 F.3d 612, 621-22 (6th Cir. 2005), the defendant made a statement to a person he wanted to recruit into a bank robbery conspiracy.  On the way to case the bank, the defendant said that after he and another man committed a crime previously, neither testified against the other and

---

[1]We note that although the government has never conceded that the evidence is 404(b) evidence, it did file a motion *in limine* alerting the defense and the court before trial that it planned on introducing the statements.

they went to prison together. The defendant argued that the statement was improper Rule

404(b) evidence, but this court held that it was properly admitted as background evidence.

It was intertwined with the attempted bank robbery offense, we reasoned, because the

statement was made on the way to case the bank, was part of the planning of the robbery, and

was relevant to establish the defendant's intent. *Id.*.[2] In *United States v. Holley*, 57 Fed.

App'x 639, 641 (6th Cir. 2003) (unpublished decision), the government introduced evidence

that the defendant, who was on trial for arson, had told a potential coconspirator about his

previous arsons. On appeal, the defendant argued that the evidence was improper 404(b)

evidence. *Id*. at 640. We disagreed, holding that the evidence was not introduced to show a

propensity to commit arson, but was rather admitted as background evidence that explained

how the conspiracy arose, and the statements were made in an attempt to recruit a

coconspirator. *Id*. at 641. Likewise, in this case, Johnson's statements about a previous bank

robbery were not introduced to show Johnson's propensity to commit crime, but was

background evidence that went to show that Johnson recruited a get-away driver as part of his

bank-robbery plan.

Furthermore, the government offered another valid reason why the statements were

relevant. The government knew that Gibson's credibility would be attacked by the defense

---

[2]The defendant in *Wesley* also argued that the evidence should have been excluded under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice. This court agreed, holding that it raised a considerable danger of the jury deciding guilt on an impermissible factor, the defendant's prior incarceration, and that "[t]his is particularly a concern where the evidence presents a close question on the sufficiency of the evidence." *Id*. at 622. In this case, Johnson does not make the argument that the evidence should have been excluded under Rule 403, and even if he had, this is a case where the sufficiency of the evidence is not a close question.

because of the plea bargain he reached with the government. The plea bargain dropped the firearm charge, among others, against Gibson.  One reason it was dropped was because Gibson said he did not know a firearm would be used in the robbery.  Thus, the government maintains that what Gibson knew at the time he joined the conspiracy was relevant to his credibility.

Finally, even if we were to conclude that the district court erred by allowing the statements, we would find the error harmless because of the overwhelming, unchallenged evidence indicating Johnson's guilt.

## C.    Johnson's Right to a Fair Trial

Johnson claims that the district court was biased against him, as evidenced by the following four events during the trial, and that the bias denied him his right to a fair trial. First, Johnson asserts that the following exchange exhibited the court's hostility toward Johnson's attorney:

Q.    After this bank robbery were you very depressed?

A.    Yes.

Q.    Were you talking of committing suicide?

A.    No, I had thoughts of it.

> MS. CARLSON:  Objection as to relevance as to his state of mind after the bank robbery.

> THE COURT:  I don't see how it's relevant unless you've got something else.

> MR. BERGER:  Well, okay.  His observations after the bankruptcy (sic).  He's told us about alleged statements made after the bankruptcy and his state of mind at that time.

THE COURT; Bankruptcy?

MR. BERGER: Bank robbery. Same thing.

THE COURT: Well, I –

MR. BERGER: I'm going no further in this area, okay.

THE COURT: Okay.

MR. BERGER: Okay.

THE COURT: Listen, you don't say okay to me.

MR. BERGER: I'm sorry, sir.

THE COURT: I tell you –

MR. BERGER: Okay.

THE COURT: – When it's okay with me. You don't respond that way unless you want some sanctions talked about.

MR. BERGER: I meant no disrespect.

THE COURT: You've done it two or three times today. Don't do it again.

MR. BERGER: Okay. I meant no disrespect.

THE COURT: Good.

MR. BERGER: I have nothing further, your Honor.

Second, Johnson claims that the district court "threatened" that he would have to testify. The court's statements took place after defense counsel received permission to have Johnson try on shoes that were used in the robbery and were found at his residence. The district court warned:

THE COURT: Okay. Go ahead. If Mr. Johnson says anything, however, he's going to testify.

MR. BERGER: I'm aware of that. Mr. Johnson, would you come up here and sit down. Mr. Johnson, do not say a word, but take off your shoes, the black shoes you're wearing now.

THE COURT: I'm a little uncertain, I'm not trying to stop you, but I'm a little uncertain how we're going to tell what the fit is if Mr. Johnson doesn't say anything, but go ahead, if you think you can.

Third, Johnson contends that the district court improperly cut off his cross-examination

of Gibson regarding Gibson's plea agreement:

Q.    Mr. Gibson, I wanted to ask you a few questions about your plea agreement, the one that you entered into. Are you familiar with that?

A.    Yes.

Q.    The plea agreement that you entered into resulted in your getting how many months?

A.    87.

Q.    But the sentence that was imposed was imposed by this Judge; is that correct?

A.    Yes.

Q.    Did the plea agreement specify what the maximum or minium would be as to the sentence?

A.    I'm not sure.

Q.    Do you have a copy of it with you?

A.    No, I do not.

Q.    When is the last time you saw it?

A.      Probably September 2003 at my sentencing.

Q.      Did the plea agreement result in any charges being dropped?

A.      Yes.

Q.      And was that the felony firearm?

A.      Yes, it was.

Q.      And what did that save you?

A.      I'm not sure. I believe seven years to be ran consecutively.

Q.      So it saved you seven years – your impression is that it saved you seven years?

A.      That would probably been up to Judge O'Meara. I don't know.

Q.      Well, you do know that the Count 2, dealing with a firearm, was dismissed, do you not?

A.      Yes, I know that.

Q.      And if it was dismissed Judge O'Meara could not sentence you on that firearm charge, could he?

A.      No.

Q.      And therefore when you negotiated a dismissal of the firearm charge, do you feel that that saved you seven years?

A.      No, not necessarily. I feel that it caused the prosecution not to charge me with that, given the facts that surrounding the case after their investigation.

Q.      Did you say on direct examination that it saved you seven consecutive years?

A.      No, I said on direct examination that I could have been charged up to according to what I've been told. I don't know for sure. I'm not good at that with the law, up to additional seven years.

I would have to study the law before I could answer you correctly as far as exactly how much time it carries, I'm not sure.

THE COURT: What are we doing this for, I mean, this is a very complicated area for lawyers and for judges. What are we trying to get this kind of information from the witness for?

MR. BERGER: I'm trying to indicate motivation for testifying like he is now.

THE COURT: Well, that's there. You don't have – if you want to argue it, you don't have to find out whether it's 57 or 58 months.

MR. BERGER: No, and I also feel his credibility is involved. Can I just ask a few more questions in this area?

THE COURT: You just asked a few more questions. Go on to something else.

Fourth, Johnson claims that the district court denigrated the testimony of defense-witness Sykes during the government's cross examination by stating:

THE COURT: All right. Unless you have something important further to get out of this witness who is uncooperative and --

MS. CARLSON: I do, your Honor.

THE COURT: -- not doing himself or anybody else any good, I think we should conclude this testimony very quickly,

Johnson moved for a mistrial because of this statement, but the district court denied the motion.

We review the denial of a motion for mistrial for abuse of discretion. *United States v. Anderson*, 353 F.3d 490, 502 (6th Cir. 2003), *cert. denied*, 541 U.S. 1068 (2004). We also review a district court's conduct during a trial under an abuse of discretion standard.

*McMillan v. Castro*, 405 F.3d 405, 409 (6th Cir. 2005). Since Johnson only raised an objection before the district court as to the comment about Sykes, we review the other allegations of bias for plain error. Plain error is "limited to those harmful ones that are so rank that they should have been apparent to the trial judge without objection, or that strike at the fundamental fairness, honesty, or public reputation of the trial." *United States v. Causey*, 834 F.2d 1277, 1281 (6th Cir. 1987).

In *Liteky v. United States*, 510 U.S. 540 (1994), the Supreme Court provided guidance as to when a district court's remarks or rulings amount to a level of bias that denies a defendant a fair trial.

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal on opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. . . . *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id*. at 555-56.

The first three of Johnson's examples of alleged bias fit squarely within the *Liteky* Court's definition of what is not the sort of judicial bias that deprives a defendant of a fair trial. The "okay" exchange merely exhibited the district court's annoyance at defense counsel's disrespectful behavior. The warning that Johnson's comments while trying on

shoes would be considered testimony was the district court's effort to protect Johnson's right not to testify. The district judge went out of his way to point out a potential pitfall to defense counsel if counsel pursued the shoe-fitting, and by so doing assisted defense counsel in making a more informed decision as to whether he should ask his client to try on the shoes in front of the jury. The district court's ruling cutting off defense counsel's questioning of Gibson regarding his plea agreement was an example of the court managing the trial by restricting repetitive questioning and the asking of questions that the witness was unable to answer.

The court's comment about the unhelpfulness of Sykes's testimony is the most serious of Johnson's allegations of bias. In *United States v. Slone*, 833 F.2d 595, 597 (6th Cir. 1987), we held that a trial court does have some discretion to inject itself into a trial and specifically into witness testimony, and that it may be difficult to determine when a court has exceeded its proper bounds. We identified the following relevant factors when determining whether a court's intrusion was improper: "if a witness is difficult, if a witness' testimony is unbelievable and counsel fails to adequately probe, or if the witness becomes inadvertently confused, judicial intervention may be needed." *Id.*, citing *United States v. Hickman*, 592 F.2d 931, 933 (6th Cir. 1979).

In other cases where we have held that judicial comments or interference in witness examination deprived a defendant of a fair trial, judicial actions far more intrusive were involved. For example, in *Hickman* the district court interrupted defense counsel numerous times, made numerous *sua sponte* objections that benefitted the prosecution, and interjected itself several times during witness testimony by asking extensive questions that either

rehabilitated the prosecution's witnesses or undermined the defendant's. We concluded that the court's frequent and one-sided intrusions deprived the defendant of a fair trial. *Id*. at 934. We also found in *Nationwide Mutual Fire Insurance Co. v. Ford Motor Co.*, 174 F.3d 801, 805-08 (6th Cir. 1999), that a district court's demeanor deprived the plaintiff of a fair trial by interrupting the plaintiff's opening statement six times, interrupting the plaintiff's witnesses, questioning the plaintiff's witnesses about matters unrelated to the scope of direct examination, admonishing plaintiff's witnesses for not being short enough in answering questions, repeatedly suggesting to defense counsel that he ought to register objections to certain testimony, pointing at defense counsel prompting him to object, and negatively commenting on plaintiff's theory of the case.

In this case, the district court's interruption of the government's cross-examination of Sykes did not "so clearly cross[] the line to reach that area of impermissible and prejudicial behavior which would warrant reversal." *United States v. Tilton*, 714 F.2d 642, 644 (6th Cir. 1983); *see also McMillan*, 405 F.3d at 412. Any negative impact on the jury was mitigated by several jury instructions informing them that any comments made by the district court should not influence their determination of guilt or innocence. The court instructed the jury:

> Another part of your job as jurors is to decide how credible or believable each witness was. This is your job, not mine. It's up to you to decide if a witness' testimony is believable and how much weight you think it deserves. You are free to believe everything a witness said or only part of it or none of it at all, but you should act reasonably and carefully in making these decisions.
> . . .
>
> . . . .
>
> Do not interpret my rulings on [the lawyers'] objections as any indication how I think the case should be decided. My rulings were based on

the Rules of Evidence, not on how I feel about the case. Remember that your
decision must be based only on the evidence that you saw and heard here in
court.

> . . . .

> Let me finish up by repeating something I've said to you earlier:
Nothing that I have said or done during this trial was meant to influence your
decision in any way.  You decide for yourselves if the Government has proved
the Defendant guilty beyond a reasonable doubt.

These instructions—combined with the fact that the court's statement was an isolated

remark and an interruption of the prosecutor, not defense counsel—leads us to conclude that

there was no error in the district court's conduct of Johnson's trial sufficient to warrant

reversal.  *See United States v. Smith*, 831 F.2d 657, 663 (6th Cir. 1987) (stressing the

importance of a district court's instruction to the jury that it was not to infer the district court's

opinion from any of its actions in finding that the district court's questioning of a witness did

not warrant reversal); *McMillan*, 405 F.3d at 412 (finding that instructions similar to the ones

issued in this case were a factor in the court's conclusion that limited intrusions by the district

court did not warrant reversal).

## D.    Sentencing

In *Booker* the Supreme Court ruled that the mandatory application of the Federal

Sentencing Guidelines violated defendants' Sixth Amendment rights, and, accordingly, the

Court rendered the Guidelines advisory.  Johnson did not raise a Sixth Amendment challenge

in district court, and therefore we review for plain error.  *United States v. Oliver*, 397 F.3d

369, 377-78 (6th Cir. 2005).  When a district court sentences a defendant under a mandatory

guidelines scheme, there is plain error. *United States v. Barnett*, 398 F.3d 516, 529 (6th Cir. 2005), *cert. dismissed*, 126 S. Ct. 33 (2005).

Johnson argues that because the district court, which imposed Johnson's sentence after oral arguments in *Booker* but before the Court rendered its decision, indicated that it would have sentenced Johnson to 180 months instead of 199 months if the Guidelines were not mandatory, we should vacate his sentences and remand to the district court for resentencing. The government agrees that remand is appropriate.

We **AFFIRM** Johnson's convictions but **VACATE** Johnson's sentences and remand for resentencing consistent with *Booker* and this court's post-*Booker* precedents. Our remand neither mandates nor prohibits the district court from imposing its previously set-forth alternative sentence.